IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| COMPANION DX REFERENCE LAB, LLC, | § | Case No. 16-33427 |
| | § | Chapter 11 |
| | § | |
| DEBTOR. | § | |
| | § | |

**DEBTOR'S EMERGENCY MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (A) AUTHORIZING
USE OF CASH COLLATERAL, (B) AUTHORIZING DEBTOR-
IN-POSSESSION FINANCING AND (C) SCHEDULING A FINAL HEARING**

**NOTICE UNDER BLR 9013(B) AND 9013(I)**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED; YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THE DEBTOR HAS REQUESTED THAT THIS MOTION BE**

**CONSIDERED AT THE DEBTOR'S FIRST DAY HEARINGS.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE OF SAID COURT:**

COMES NOW COMPANION DX REFERENCE LAB, LLC ("CompanionDx" or the "Debtor"), and files this emergency motion (the "Motion") to obtain post-petition credit to provide a revolving line of credit facility of up to $900,000 in new money to (1) maintain the operations of the Debtor for a sufficient amount of time necessary to effectuate a sale of assets by the Debtor pursuant to a Stalking Horse Bid/Auction Procedure, and (2) undertake steps towards a liquidating plan of reorganization with the objective of preserving and maximizing value for the creditors of this estate.   The Motion is also filed to seek authority and approval for the use of "cash collateral" with the provision of replacement liens as adequate protection.

## <u>INTRODUCTION</u>

1.      By this Motion and for the reasons set forth below, pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507(b), and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules"), the Debtor respectfully requests entry of an interim financing and cash collateral order (the "Interim Financing and CC Order") and a final financing and cash collateral order (the "Final Financing and CC Order") (collectively the "Financing and CC Orders") seeking, among other things the following:

a)   authorizing the following DIP Loan terms (hereinafter referred to as the "DIP Loan Terms"):

| TABLE 1 – DIP LOAN TERMS | |
|---|---|
| **DIP BORROWER:** | COMPANION DX REFERENCE LAB, LLC, as Debtor in possession under Chapter 11 of the Bankruptcy Code (the "Borrower" or the "Debtor"). |
| **DIP LENDER:** | CDX-DIP Investment, LLC (the "DIP Lender"). |
| **DIP GUARANTOR** | None |
| **DIP FACILITY:** | A senior secured super-priority revolving line of credit facility (the "DIP Loan") in an aggregate principal amount of up to $900,000.00 (the "DIP Loan" or the "DIP Loan Facility"). |
| **FEES** | The DIP Lender shall be entitled to a $25,000 Origination Fee to be used to pay the legal fees and expenses associated with the documentation and memorialization of the DIP Loan facility. |
| **LIENS, SECURITY INTERESTS AND OTHER SECURITY:** | To secure the DIP Loan, the DIP Lender shall be granted the following:<br><br>1. Under 11 U.S.C. § 364(c)(1), the DIP Lender shall be granted an allowed priority administrative expense claim against the Debtor (the "DIP Priority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expense claims of any kind asserted against the Debtor, subject only to the administrative claims of the Debtor's CRO, the Debtor's DIP counsel, and for US Trustee's Fees. Once an Official Unsecured Creditors Committee (the "Committee") is appointed, it is contemplated that there will be a limited carve-out for the Committee's legal counsel, to be negotiated.<br><br>2. Under 11 U.S.C. §§ 364(c)(2) and 364(d)(1), the DIP Lender shall be granted a valid, fully perfected, unavoidable, security interest and lien in prepetition and post-petition Collateral (as defined herein) that is senior to and primes Existing Lien Indebtedness, subject only to the prepetition indebtedness owed to Steve Harter in the approximate amount of $500,704.00, together with prepetition and post petition interest and allowed reasonable and necessary attorney fees. |

|  | 3. Under 11 U.S.C. § 364(c)(2) of the Bankruptcy Code, the DIP Lender shall be granted a valid, fully perfected, unavoidable, first priority, senior security interest in and lien on all of the post-petition unencumbered Collateral. |
|---|---|
| **CASH COLLATERAL:** | As provided for under 11 U.S.C. § 363(a) the term "Cash Collateral" shall mean, as of the Filing Date, the Debtor's cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents. Debtor shall be granted permission to use Cash Collateral, and the Prepetition Secured Creditors listed in Table 7, infra, at p __, shall be granted replacement liens on post petition Cash Collateral generated by the Debtor in the same priority as set forth in Table 7, infra. |
| **COLLATERAL:** | As used herein, the term "Collateral" shall mean all of the Debtor's prepetition and post-petition tangible or intangible assets, including, but not limited to, all cash, cash equivalents, deposit accounts, accounts receivable, chattel paper, contract rights, inventory, instruments, documents, computer software, licensing agreements, equipment, leases, leasehold interests, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, and general intangibles. |
| **USE OF PROCEEDS:** | The proceeds of the DIP Loans shall be used by the Debtor (i) for working capital purposes and administrative expenses incurred in the Bankruptcy Case in accordance with the Budget referred to herein (subject to permitted variances), including the payment of the $25,000 Fee of the DIP Lender, payment of the $50,000 balance of the retainer to the undersigned counsel for the Debtor-in-Possession, the fees and expenses of the CRO, all as provided in the budget, and (ii) to repay in full all amounts outstanding under the DIP Loans. |
| **INTEREST RATE:** | Interest on the DIP Loans shall be payable monthly in arrears in cash. The outstanding principal amount of all DIP Loans shall bear interest rate equal to twelve percent (12%). Default Rate: 2.00% additional per annum interest payable on demand in cash. |
| **MATURITY:** | The DIP Loan shall be repaid in full at the earliest to occur of (i) the 21st day following the Filing Date if, as of such date, the Bankruptcy Court shall not have entered the Final Borrowing and CC Order, (ii) 120 days following the Filing Date, if, by such date, the Bankruptcy Court has not confirmed a Plan of Reorganization, (iii) the effective date under a confirmed Plan of Reorganization, (iv) the date of consummation of a sale of all or substantially all of the assets or stock of the Debtor under section 363 of the Bankruptcy Code (a "363 Sale"), or (v) the termination of the DIP Loan by the DIP Lender upon an Event of Default (any such date, the "Maturity"). Unless otherwise agreed to by the DIP Lender, any confirmation order entered in the Bankruptcy Case must provide for the repayment in full of the DIP Loan on or before the effective date of |

| | |
|---|---|
| | the Plan of Reorganization, which Plan of Reorganization shall not discharge or otherwise affect in any way the obligations of the Debtor to the DIP Lender under the DIP Loan. |
| **REPRESENTATIONS AND WARRANTIES:** | The DIP Loan documentation shall include representations and warranties that are substantially the same as those set forth in the agreements memorializing the CDX Financial prepetition Loan (modified as necessary to reflect the commencement of the Case), plus those that are customary in DIP loans of this type and such other matters as the DIP Lender and its advisors shall reasonably require in the DIP Loan documentation. |
| **CONDITIONS PRECEDENT:** | The DIP Loan documentation shall include customary closing conditions, including, without limitation, entry of the Interim Financing and CC Order. |
| **COVENANTS:** | The DIP Loan documentation shall include affirmative and negative covenants that are substantially the same as those set forth in the agreements memorializing loan the CDX Financial prepetition loan, plus those that are customary for DIP loans of this type, and such other covenants as the DIP Lender and its advisors shall reasonably require in the DIP Loan documentation, including the following: |

**Affirmative Covenants.**

1. delivery to the DIP Lender as soon as practicable in advance (at least 48 hours) of filing with the Bankruptcy Court the proposed Interim Financing Order, the Final Order and pleadings proposed to be filed in the Bankruptcy Court seeking approval of the DIP Loan (which must be in form and substance reasonably satisfactory to the DIP Lender), all other proposed orders and pleadings related to the DIP Loan (which must be in form and substance reasonably satisfactory to the DIP Lender and its advisors), any plan of reorganization or liquidation, and any disclosure statement related to such plan;

2. compliance with Milestones set forth below;

3. access to all information, documents and communications related to or otherwise referencing the Debtor's claims or causes of action against any third party, including, without limitation, Chapter 5 claims or causes of action under 11 U.S.C. §§ 544, 547, 548, 549 and 550.

4. access to all information, documents and communications related to or otherwise referencing the Debtor's net operating losses ("NOL") as soon as practicable in advance of the filing and thereafter on a rolling basis.

5. access to information (including historical financial

<table>
<tr>
<td></td>
<td>information), including, without limitation, bi-weekly (every other week) scheduled meetings, as mutually agreed, with the Debtor's senior management and the Chief Restructuring Officer, Chief Financial Officer, or such other officer of the Debtor with similar responsibility, and other Debtor advisors, which meetings shall include reports with respect to sales, accounts receivable, net operating losses, location of equipment and other matters reasonably requested by the DIP Lender and its advisors.

**Negative Covenants.**

1. not creating or permitting to exist any liens or encumbrances on any Collateral, other than liens securing the DIP Loan, any security interests and liens of the Prepetition Secured Lenders;

2. not prepaying any Prepetition Secured Loans or unsecured claims except as permitted under the approved Budget.</td>
</tr>
<tr>
<td>**BUDGET COVENANT:**</td>
<td>Prior to the hearing on this Motion, the Debtor shall deliver to the DIP Lender an approved two-week budget commencing with the week beginning on the Filing Date, containing line items of sufficient detail to reflect the Debtor's projected receipts and disbursements for the initial two-week period, and such budget shall be in form and substance reasonably satisfactory to the DIP Lender and its advisors ((the "Initial Two-Week Budget"). As soon as the DIP Lender approves the Initial Two-Week Budget, it will be filed with the Court and served on the parties who are being served with a copy of this Motion.

The Debtor shall deliver to the DIP Lender a report (the "Budget Report"), delivered each week commencing on the first business day following the 10th day after the Filing Date, with subsequent weekly reports being due seven days thereafter. The Budget Report show actual receipts and disbursement during the initial week and for each succeeding week explaining variances with respect to disbursements from the budget that in the aggregate are an amount that is the greater of (i) 10% and (ii) $10,000 for all disbursements in the Budget. Every two weeks, beginning on the first business day following 17 days after the Filing Date, Debtor shall deliver to the DIP Lender supplements to the Budget showing projected receipts and disbursements for the second two-week period, and this shall continue until the DIP Loan matures.</td>
</tr>
<tr>
<td>**SALE/AUCTION PROCESS:**</td>
<td>Any auction and sale procedures ("Auction Procedures") that the Debtor proposes must (a) include the right of the DIP Lender to credit bid in connection with any such sale(s) and (b) require all proceeds of such sale(s) to be immediately applied to the obligations</td>
</tr>
</table>

| | |
|---|---|
| | owing to the DIP Lender. |
| | The Auction Procedures and the auction procedures order must be in form and substance reasonably acceptable to the DIP Lender and its advisors and may not be amended or otherwise modified in a material manner adverse to the DIP Lender without the consent of the DIP Lender. |
| **EVENTS OF DEFAULT** | The following shall constitute "Events of Default" under the DIP Loan: |

The following shall constitute "Events of Default" under the DIP Loan:

1. Failure of the Debtor to satisfy any obligation under any DIP Loan documentation and such failure not being remedied within five (5) business days after receipt of written notice of the failure; provided that the foregoing grace period shall not apply to (a) entry of a Final Order and (b) failure to meet any of the Milestones, neither of which, for the avoidance of doubt, shall be subject to any grace period;

2. Failure of the Debtor and the DIP Lender to agree upon the Budget proposed by the Debtor;

3. Without the written approval of the DIP Lender, the Debtor making payments to third parties that exceed the payments authorized under the Budget (with variances);

4. Without the written approval of the DIP Lender, the filing of any motion by the Debtor seeking to obtain credit or incur indebtedness, or the obtaining of credit and incurrence of indebtedness that is: (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral, or (ii) entitled to administrative priority status;

5. The filing or commencement of any action or proceeding by the Debtor (or any third party with the Debtor's assistance or support) against the DIP Lender or CDX Financial;

6. The Debtor's violation of the Interim Financing Order or Final Financing Order;

7. Without the written approval of the DIP Lender, the filing or commencement of any action or proceeding for authority to recover by any person from the Collateral or any adequate protection liens granted with respect thereto for any costs of preservation or disposition thereof under section 506(c) of the Bankruptcy Code or authorizing the use of Cash Collateral;

8. institution or support of any judicial proceeding by the

| | Debtor seeking to challenge the validity of any portion of the DIP Loan or the the CDX Financial Prepetition Loan, or which seeks to void, limit, subordinate or otherwise adversely affect any security interest or lien created by or in relation to the DIP Loan or the CDX Financial Prepetition Loan. |
|---|---|
| **REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT:** | On not less than five (5) business days' prior written notice by the DIP Lender to counsel for the Debtor, the Office of the United States Trustee (and counsel to any appointed official committee of unsecured creditors) of the occurrence and continuance of an Event of Default (following the expiration of any applicable grace period), the DIP Lender may (i) declare the DIP Loans to be immediately due and payable, (ii) terminate the Debtor's ability to access the DIP Loan proceeds and to use Cash Collateral; and/or (iii) exercise all rights and remedies, without further order of or application or motion to the Bankruptcy Court. |
| **GOVERNING LAW:** | All DIP Loan documentation shall be governed by the laws of the State of Texas, except as governed by the Bankruptcy Code. |
| **ASSIGNMENTS, PARTICIPATIONS, ETC.:** | The DIP Lender shall be permitted to sell or assign its rights and obligations hereunder, or any part thereof, to any person or entity without the consent of the Debtor. The DIP Lender shall be permitted to grant participations in such rights and obligations, or any part thereof, to any person or entity without the consent of the Debtor. |
| **OUT-OF-POCKET EXPENSES:** | All fees, including legal and other professional fees (including any financial advisor to be retained by the DIP Lender, and all reasonable out-of-pocket expenses associated with the transaction are to be paid by the Debtor without the need for the filing of any applications with the Bankruptcy Court. |

| **MILESTONES:** | | |
|---|---|---|
| | **DATE** | **ACTION** |
| | No later than 21 days following the Filing Date | Final Financing and CC Order shall be approved and entered by the Court. |
| | No later than 30 days following the Filing Date | Debtor will enter into an Asset Purchase Agreement ("APA") to sell the certain assets to an Affiliate of the DIP Lender that will act as a Stalking Horse. The purchaser under the APA shall be entitled to reasonable buyer protection provisions. A |

| | | |
|---|---|---|
| | | liquidating plan of reorganization and Disclosure Statement shall be filed. |
| | No later than 45 days following the Filing Date | The Bankruptcy Curt shall enter an Order approving auction procedures. |
| | No later than 60 days after the Filing Date. | Disclosure Statement shall be considered and approved by the Court. |
| | No later than 70 days following the Filing Date | Auction to be held. |
| | No later than 75 days following the Filing Date | Auction results shall be approved by the Bankruptcy Court.  Plan of Reorganization must be confirmed by Bankruptcy Court |

b)  Authorizing the Debtor, pursuant to 11 U.S.C. § 363 to use "cash collateral".

c)  authorizing the Debtor to execute and deliver the DIP Loan transaction documents and to perform such other and further acts as may be necessary and appropriate in connection therewith and, on an interim basis, in accordance with the Budget, to use Cash Collateral and to access the DIP Loan, pursuant to the terms and conditions of the DIP Loan;

d)  authorizing the Debtor, pursuant to the DIP Loan Terms, to use the DIP Loan proceeds solely in accordance with the "Budget", and not otherwise;

e)  modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the Interim Order, and, as later applicable, the Final Order;

f)  waiving any applicable stay (including under Rule 6004 of the Bankruptcy Rules) and the provision of immediate effectiveness of this Interim Financing and CC Order, and as later applicable, the Final Financing and CC Order;

g)  scheduling an emergency interim hearing (the "Interim Hearing") on this Motion for the Court to consider entry of the Interim Financing and CC Order; and

h)  scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") on this Motion for a date that is before the 21st day after the Petition Date (as defined below) to consider entry of the Final Financing and CC Order authorizing the Debtor

to use Cash Collateral and to obtain, on a final basis, the DIP Loan, pursuant to the DIP Loan Term Sheet.

2.      In support hereof, the Debtor relies on the declaration of Rey Stroube (the "First Day Declaration"), filed concurrently with the Motion on July 2, 2016 (the "Petition Date").  In further support of this Motion, the Debtor, by and through its undersigned proposed counsel, respectfully represent as follows:

## JURISDICTION AND VENUE

3.      This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K) and (M).  The Court can enter final orders consistent with Article III of the United States Constitution. Venue of these Case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507(b), and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-1 and 9013-1.  The Debtor operates in and has its main assets in Harris County, Texas, in the Houston Division of the Southern District of Texas.

## BACKGROUND

### A.      About the Debtor's Business

4.      CompanionDx is a limited liability company organized under the laws of the State of Texas on June 29, 2011.  Companion DX is a laboratory testing facility involved in the following advanced testing techniques.

    **a.  Next-Generation Sequencing ("NGS")**.  An advanced DNA sequencing technology that allows the rapid sequencing of large stretches of DNA base pairs spanning the entire genome, NGS accurately detects cancer-specific mutations in very early neoplastic cells before morphological changes are apparent.

CompanionDx's NGS evaluates the key characteristics of the patient's tumor. The test is completed via a biopsy sample to evaluate the tumor's DNA. CompanionDx conducts NGS to analyze somatic mutations that may affect how a patient responds to a treatment plan.

NGS provides a patient's tumor molecular profile and identifies resistance mechanisms present in an evolving tumor.  It provides familial genetic testing of cancers, and targeted therapies to patients with specific mutations.

**b.  Pharmacogenomics Testing ("PGx").**  Pharmacogenomics is the study of how genes affect a person's response to drugs. CompanionDx's PGx evaluates the patient's metabolic profile, the potential drug/gene and drug/drug interactions. This test establishes a clear understanding of the patient's potential drug/gene and drug/drug interaction. Starting with a buccal swab, CompanionDx conducts PGx to analyze germline variants that may affect how a patient responds to certain drugs. CompanionDx identifies patient-specific metabolism for CYP2D6, CYP2C9, CYP2C19, CYP3A4/3A5, CYP1A2, VKORC1, DPYD, TPMT, UGT1A1, Factor II, Factor V, MTHFR, SLCO1B1 and TYMS. The PGx report will reveal if a patient is an ultrarapid, extensive, intermediate or poor metabolizer of relevant drugs.

**c.  Therapeutic Drug Monitoring.**  Medical doctors require diagnostic solutions that improve clinical management of patients. CompanionDx is a leading diagnostic and medical decision support company providing practitioners with medication monitoring. To achieve this, CompanionDx uses the latest drug screening technologies that confirms patient compliance with drug regimens, detection of medication duplications (e.g., opiates) and detection of illicit drug use. Used in combination with the company's pharmacogenomics testing, medication monitoring enables the optimization of drug dosing and the minimization of drug interactions.

**d.  Certifications and Accreditations.**  Under the Clinical Laboratory Improvement Amendments ("CLIA"), 42 U.S.C. §263a, laboratory testing facilities are required to be certificated by their state before they can accept human samples for diagnostic testing. Companion Dx is certified by the CLIA as well as by the State of Texas, State of California, New York State, and the State of Florida, as well as other states to conduct testing.  The Debtor has also received its accreditation from the College of American Pathologists ("CAP").

**B.  The Debtor's Current Shareholders.**

3.  Debtor's current shareholders are as follows:

| TABLE 2 | | |
|---|---|---|
| **NAME OF MEMBER** | **CLASS/NUMBR** | **100%** |

11

| TABLE 2 | | |
| --- | --- | --- |
| **NAME OF MEMBER** | **CLASS/NUMBR** | **100%** |
| NCMLAB, LLC/Steve S. Harter<br>1224 N. Post Oak Rd, Suite 105<br>Houston, TX 77055 | Class B Voting<br>575 Units | 4.2% |
| R. L. Crosby Interests (Roddie Lee)<br>7670 Woodway Dr., Suite 375<br>Houston, TX 77063 | Class B Voting<br>1681 Units | 12.3% |
| Steve Blum<br>2004 Fairview St<br>Houston, TX 77019 | Class B Voting<br>1681 Units | 12.3% |
| David Philip Kapiloff<br>419 Thamer Lane<br>Houston, TX 77024 | Class B Voting<br>1681 Units | 12.3% |
| Kriter LLC/Kevin Paul Rosenblatt<br>4909 Valerie St.<br>Bellaire, TX 77401 | Class B Voting<br>3362 Units | 24.7% |
| Michael Stewart<br>2801 Waterwall Dr, Apt 603<br>Houston, TX 77056 | Class B Voting<br>2921 Units | 21.4% |
| W. Tim Sexton<br>26 Crestwood Dr<br>Houston, TX 77007 | Class A Voting<br>500 Units | 3.7% |
| Felix B. Maduro, c/o Agencias<br>Feduro SA, Anevidas Ricardo J.<br>Alfaro y Miguel Brostello #36<br>Panama City, Republic of Panama | Class A Voting<br>125 Units | 0.9% |
| KCW Corp. (KC Weiner)<br>Texas Crude Energy,<br>2803 Buffalo Speedway<br>Houston, TX 77098 | Class A Voting<br>500 Units | 3.7% |
| KNA Partners - John Beeson<br>550 Waugh Drive<br>Houston, TX 77019 | Class A Voting<br>250 Units | 1.8% |
| Charles Singletary<br>4913 Westview Drive<br>Austin, TX 78731 | Class B Voting<br>200 Units | 1.5% |
| David Putska<br>3394 Chevy Chase Dr<br>Houston, TX 77019 | Class A Voting<br>100 Units | 0.7% |

| TABLE 2 | | |
| --- | --- | --- |
| **NAME OF MEMBER** | **CLASS/NUMBR** | **100%** |
| Lipper Investments, LP<br>Hirsch & Westheimer<br>Bank of America Center<br>700 Louisiana, 25th Floor<br>Houston, TX 77002 | Class A Voting<br>50 Units | 0.4% |

**C.     Debtor's Current Officers and Directors.**

4.     Debtor's management consists of the following individuals:

| | |
| --- | --- |
| Michael Stewart, Chief Executive Officer and Director | Mr. Stewart is an investor and has been involved in numerous businesses.  He graduated from Rice University in 1965 with a BS in Physics and a Masters Degree in physics. |
| H. Rey Stroube, IV, Chief Financial Officer | Bachelor of Science, Business Administration with Special Attainments in Commerce, Washington and Lee University – Lexington, Virginia, graduating in 1991.  Mr. Stroube is a certified public accountant ("CPA"), liensed in the State of Texas, and is certified as a turnaround professional ("CTP").  Mr. Stroube has been with the company since June of 2012. |
| Kevin Rosenblatt, Chief Medical Officer. | Dr. Rosenblatt a practicing Anatomic Pathologist. Dr. Rosenblatt graduated from University of Texas Southwestern Medical Center at Dallas Southwestern Medical School in 2000 and has been in practice for 15 years. |
| Steven Blum, Executive Vice President and Director | Mr. Blum is a founder and has been involved in numerous businesses. He graduated from the University of Wisconsin – Oshkosh with a Bachelor of Business Administration in 1982. |
| Prem Gurnani, Vice President, Product Marketing and Chief Technology Officer | Prem Gurnani earned his M.S. in biomedical engineering from UT Arlington/UT Southwestern Medical Center.  He is a trained scientific professional, entrepreneur and consultant with more than seven years of proficiency in the field of biomedical research, design, development and support. |
| Mehdi Dehghani Assistant Clinical Laboratory Director | Dr. Dehghani received his PhD in clinical biochemistry from Shiraz University, and completed his post-doctoral research fellowship at the University of Texas.  He is a clinical scientist with over ten years of training in biochemistry and molecular diagnostics, and has extensive background in cancer biology, cell signaling, and Pharmacogenomics. |
| Sitara Waidyaratne, Vice President, Clinical | Sitara Waidyaratne is a highly accomplished and results-driven clinical laboratory executive, with proven expertise |

| Laboratory Operations | in molecular testing and an unparalleled track record. Sitara has over 15 years of clinical operations experience in both diagnostic and hospital settings, working alongside many clinical professionals.  She was a Senior Scientist at Quest Diagnostics prior to joining CompanionDx. |
| Prem Gurnani, Vice President, Product Marketing and Chief Technology Officer | Prem Gurnani earned his M.S. in biomedical engineering from UT Arlington/UT Southwestern Medical Center.  He is a trained scientific professional, entrepreneur and consultant with more than seven years of proficiency in the field of biomedical research, design, development and support. |

**D.     Debtor's Assets**

**Cash as of Filing Date: $11,507.00.**

**Accounts Receivable:** *See* **Exhibit "1"**.

**Supplies Inventory**: *See* **Exhibit "2"** hereto.

**Potential Lawsuits:**

5.     **XIFIN Claims and Counterclaims**. On or about February 15, 2012, the Debtor entered into a Services Agreement with XIFIN, Inc., a company located at 3394 Carmel Mountain Road, San Diego, CA 92121.  Pursuant to the agreement XIFIN was to perform billing and claims processing for the Debtor commencing on or about February 15, 2012, for a forty eight month period.  During the course of the XIFIN engagement, the Debtor discovered that XIFIN had failed to bill numerous account debtors, and Debtor ultimately declined to renew the contract with XIFIN.  XIFIN filed suit against the Debtor in California to recover amounts it claims are due under the terminated contract.  Debtor asserted a substantial counterclaim against XIFIN for (among other claims) failing properly to bill and/or properly pursue payment for several thousand laboratory tests processed by the Debtor.  Debtor believes that damages incurred by the Debtor are substantial, in the approximate amount of up to $5,000,000.

5.

**Secured Debt:**

6.     The original capitalization of the Debtor was accomplished by five investors referred to as founders (the "Founders") loaning substantial sums of money to the Debtor (the "Founder's Notes"), secured all of the Debtor's assets.  On September 25, 2012, the original five Founders were granted liens and security interests in the Debtor to secure the following original capitalization loans:

| TABLE 4 | | | |
|---|---|---|---|
| **NAME OF FOUNDERS** | **ORIGINAL AMOUNT INVESTED AS SECURED LOAN** | **PAYMENTS RECEIVED** | **CURRENT BALANCE** |
| Rod L. Crosby | $339,353.00 | | $339,353.00 |
| Steve Blum | $100,000.00 | | $100,000.00 |
| David Philip Kapiloff | $439,153.00 | | $439,153.00 |
| Kevin Paul Rosenblatt | $200,000.00 | | $200,000.00 |
| Steve Harter | $3,895,000.00 | $3,394,296.00 | $500,704.00 |

**The 2013 Dispute Arose Over Management and Control.**  In February 2013, a dispute among the Founders over management and control of the Debtor came to a head.  Steve Harter was by far the largest investor in the Debtor, and held 50% of the membership interests in the Debtor, but his membership certificates gave him 100% voting control.  The other 50% membership interests held by the other four Founders were non-voting in nature.  Michael Stewart, the current Chief Executive Officer, was

brought in to resolve the management dispute, and helped negotiate a transaction with Harter whereby the Debtor agreed to repay Harter's $3,895,000.00 secured capitalization loan, and Harter relinquished his membership interest in the Debtor. From April to June 2013, the Debtor raised additional capital in the amount of $3,450,000, $1,000,000 of which was used to make the first payment on Harter's $3,895,000.00 secured capitalization loan.  Harter's loan continued to be secured by a first priority lien and security interest in all of the Debtor's assets until repaid in full.  Over the next two years, Harter's loan was paid down $3,394,296.  The current balance is $500,704.  The pay-down on the Harter loan also came from proceeds of loans made to the Debtor from two of the Remaining Founders and other investors, including Michael Stewart, as follows:

| TABLE 5 | | | |
|---|---|---|---|
| NAME OF LENDER | AMOUNT OF UNSECURED LOAN | PAYMENTS RECEIVED | CURRENT BALANCE |
| Rod L. Crosby | $1,500,000.00 | $00.00 | $1,500,000.00 |
| David P. Kapiloff | $1,500,000.00 | $00.00 | $1,500,000.00 |
| Michael Stewart | $1,500,000.00 | $00.00 | $1,500,000.00 |
| Tim Sexton | $500,000.00 | $00.00 | $500,000.00 |
| Charles Singletary | $250,000.00 | $00.00 | $250,000.00 |
| David Putska | $200,000.00 | $00.00 | $200,000.00 |
| TOTAL: | $5,450,000.00 | | $5,450,000.00 |

6.      **The 2016 CDX Financial Loan.**  On February 4, 2016, CDX Financial, LLC ("CDX Financial") made a $2,500,000,00 loan to the Debtor secured by a lien and security interest in all assets of the Debtor (the "CDX $2,500,000.00 Loan Facility"), pursuant which the remaining founders, Rod L. Crosby, Steve Blum, David P. Kapiloff

and Kevin Rosenblatt (the "Remaining Founders"), subordinated the liens and security interests securing their Founder Notes to the liens and security interests granted to secure the CDX $2,500,000.00 Loan Facility.  Thereafter, during the months of April – June 2016, CDX Financial loaned an additional $795,000 to the Debtor (the "CDX Financial Supplemental Loan"), but three of the four Remaining Founders, Rod L. Crosby, David P. Kapiloff and Kevin Rosenblatt, did not subordinate the liens and security interests securing  their Founder Notes to the CDX Financial Supplemental Loan.  The CDX Financial financing is presented graphically below:

| TABLE 6 | | | |
|---|---|---|---|
| NAME OF LENDER | CDX FINANCIAL SECURED LOANS | PAYMENTS RECEIVED | CURRENT BALANCE |
| Rod L. Crosby | $165,000.00 | $00.00 | $165,000.00 |
| David P. Kapiloff | $365,000.00 | $00.00 | $365,000.00 |
| Michael Stewart | $822,000.00 | $00.00 | $822,000.00 |
| Tim Sexton | $390,000.00 | $00.00 | $390,000.00 |
| KCW Corp. – KC Weiner | $1,170,000.00 | $00.00 | $1,170,000.00 |
| KNA Partners – John Beeson | $100,000.00 | $00.00 | $100,000.00 |
| Charles Singletary | $100,000.00 | $00.00 | $100,000.00 |
| David Putska | $200,000.00 | $00.00 | $200,000.00 |
| TOTAL: | $3,312,000.00 | | $3,312,000.00 |

7.      Thus the following is a graphic presentation of the total prepetition

17

secured creditors of the Debtor (the "Prepetition Secured Creditors"), not including capital lease obligations:

| TABLE 7 | | |
|---|---|---|
| **SECURED CREDITOR** | **CURRENT BALANCE** | **PRIORITY** |
| Steve Harter | $500,704.00 | First Lien |
| CDX Financial | $2,500,000.00 | Second Lien |
| Remaining Founders | $1,078,506.00 | Third Lien |
| CDX Financial Supplemental Loan | $822,000.00 | Fourth Lien[1] |
| **TOTAL** | $4,901,210.00 | |

8.      **Unsecured Debt.**  As set forth Table 5, infra, at page 18, there were certain unsecured loans made by members of the Debtor in the amount of $5,450,000.00. In addition, the unsecured prepetition trade debt is $3,659,324 if excluding royalties or $4,184,324 if including royalties.   This does not include estimated "Honorarium" obligations in the approximate amount of $1,000,000.00.

## BASIS FOR RELIEF

**I.      Standards for Approval under Sections 364(c) and 364(d)(1).**

9.      Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c).

33.      In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain post-petition credit secured by a "priming" lien

---

[1] Michael Stewart and KC Weiner dispute that CDX Financial is in the fourth position with respect to the CDX Financial Supplemental Loan.

from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor

cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.

11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) provides, in relevant part, that a court may,

after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the  estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

> 10.     In evaluating proposed post-petition financing under sections 364(c) and

364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally

consider various factors including whether:

> a.     unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.     the credit transactions are necessary to preserve assets of the estate;
>
> c.     the terms of the credit agreement are fair, reasonable, and adequate;
>
> d.     the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the Debtor's estate and their creditors; and
>
> e.     the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc*., 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors

in making a determination under section 364(c)); *In re Crouse Group*, Inc., 71 B.R. 544 (Bankr.

E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

11.     Section 364 of the Bankruptcy Code also allows for post-petition financing secured by a priming lien.  Section 364(d)(1) provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt if:

(i)     the trustee is unable to obtain such credit otherwise; and

(ii)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

12.     For the reasons discussed below, the Debtor satisfy the standards required to access post-petition financing on a superpriority claim and priming lien basis under Sections 364(c) and 364(d) of the Bankruptcy Code.

A.      **The Debtor Cannot Obtain Financing on More Favorable Terms.**

13.     In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

14.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct

such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

15.     As set forth above and in the First Day Declaration, the Debtor, with the assistance of their financial and other advisors, after conducting marketing efforts and carefully reviewing the various alternatives, determined that the DIP Loan is the best available option for, among other things, the following reasons: (i) the DIP Loan (after being revised by extensive negotiations and concessions) offered better overall terms when compared to the overall terms of the considered alternatives; (ii) the DIP Loan had the highest certainty of closing given that, among other things, the Debtor were already indebted to such lenders, which incentivized such lenders to provide financing to, among other things, protect their economic interests; (iii) the DIP Lender have a substantial base of knowledge with respect to the Debtor's business, their capital structure and the Pre-Petition Collateral, which knowledge ultimately saved the estate diligence-related time and expense.

**B.      The DIP Loan is Necessary to Preserve the Value of the Debtor's Estates.**

16.     As Debtor in possession, the Debtor have a fiduciary duty to protect and maximize their estates' assets. See *CFTC . v. Weintraub,* 471 U.S. 343, 352 (1985); *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir 1988).  The DIP Loan, if approved, will provide working capital critical to funding the Debtor's remaining operations.  Without access to the DIP Loan, the Debtor would be forced to cease

operating, which would result in immediate and irreparable harm to their businesses and assets by depleting going concern value.  Because the Debtor's available and projected liquidity is insufficient to fund a plan, the credit provided under the DIP Loan is necessary to preserve the value of the Debtor's estates for the benefit of all stakeholders.

**C.**   **Terms of the DIP Loan are Fair, Reasonable and Adequate under the Circumstances.**

17.   In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc*., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. See Transcript of Record at 740:4-6, *In re Lyondell Chem. Co*., No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

18.   Given the urgent need of the Debtor to obtain financial stability for the benefit of all parties in interest, the terms of the DIP Loan are fair, appropriate, reasonable and in the best interests of the Debtor, their estates and their creditors. The DIP Loan Documents were negotiated extensively by the Debtor and the DIP Lender, in good faith and at arm's length as required by Section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel.

**D.**   **Entry into the DIP Loan Documents Reflects the Debtor's Reasonable Business Judgment.**

19.     A Debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Case consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

48.     Bankruptcy courts typically defer to Debtor's business judgment on the decision to borrow money unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. at 974.  In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor'ss estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

20.     For the reasons set forth above, the Debtor submit that the entry into the DIP Loan is the exercise of the Debtor's reasonable business judgment.

**E.   Proposed Adequate Protection Provisions are Appropriate, Reasonable and**

**Justified.**

21.     To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility.  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. What constitutes adequate protection must be decided on a case-by-case basis.  *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).  When priming of liens is sought under section 364(d), the courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens.  *See In re Utah 7000, LLC*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah July 3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986).

22.     Courts have considered the preservation and enhancement of collateral to be a critical component of adequate protection.  In determining the sufficiency of adequate protection, the Third Circuit noted, in *In re Mt. Olive Hospitality, LLC*, that "a number of bankruptcy courts have looked favorably upon the use of cash collateral where its use served to enhance the secured creditor's position through the generation of

additional value." Civ. No. 13-3395, 2014 U.S. Dist. LEXIS 42886, at *16-17 (Mar. 31, 2014) (citing *In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993) ("the concept [of adequate protection] consists of stability in collateral value rather than any particular level of value") (citation omitted); *In re T.H.B. Corp.*, 85 B.R. 192, 193-95 (Bankr. D. Mass. 1988) (stating that part of the Bank's adequate protection was the "fact that the proceeds of accounts receivables are being used by the Debtor to generate new inventory and accounts", and that "[t]he use of the Bank's cash collateral . . . is an element of the Bank's adequate protection"); *Bankers Life Ins. Co. v. Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr. D. Utah 1981) (holding similarly) The Debtor will make a similar showing.

23.     As shown in the Cross Affidavit in support of the first day motions, adequate protection is necessary because the Debtor's operations have ceased.  Future revenue will not make up for the expenditures.  As shown by the budget, the expenditures necessarily decrease the Lenders' collateral position.  The Cross Affidavit explains that, absent a sale that uses cash collateral to market the assets, the Debtor will not realize the same value at auction for their assets and the creditors will be harmed.

24.     The proposed adequate protection provided to the Pre-Petition Secured Parties is comprised of, among other things, (i) continuing valid, binding, enforceable and automatically and properly perfected post-petition security interests in and liens on the DIP Collateral (the "Adequate Protection Liens") which such Adequate Protection Liens are junior only to the

25.     Carve-Out, and the DIP Liens and (ii) allowed superpriority administrative expense claims (the "Adequate Protection Superpriority Claims") that are subject only to the repayment in full in cash of the Carve-Out and the DIP Superpriority Claim (and, with respect to the Junior Adequate Protection Superpriority Claim, subject also to the

repayment of the Senior Adequate Protection Superpriority Claim).

26.     The Debtor believe that the adequate protection proposed herein to protect any diminution in value of the Pre-Petition Secured Parties' interest in the Pre-Petition Collateral is fair and reasonable. Further, in reliance upon, among other things, such adequate protection, the Pre-Petition Senior Secured Parties have consented to the priming of Pre-Petition Senior Loan Obligations.  The consent of the Pre-Petition Senior Secured Parties permits the Debtor to avoid potentially time consuming and unpredictable priming litigation.  The Pre-Petition Senior Lenders' consent to the priming of their liens thus permits the Debtor to save considerable resources, not to mention avoid a delay, in obtaining post-petition financing.  And importantly, the proposed adequate protection shall only be provided to the extent there is any diminution in value to the Pre-Petition Secured Parties' interest in the Pre-Petition Collateral.  Accordingly, based upon the foregoing, the Debtor respectfully request that the Court authorize the Debtor to provide the adequate protection described above to such parties.

**F.      Approval of Cash Collateral Use is Reasonable and Necessary.**

27.     Section 363 of the Bankruptcy Code generally governs the use of estate property.

Section 363(c)(2)(A) permits a debtor-in-possession to use cash collateral with the consent of the secured party.  The Debtor have been able to secure an agreement from the Lender on a consensual Interim Order.  The Interim Order will allow the Debtor to use the Collateral, including the DIP Collateral, subject to an agreed upon budget.

28.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Considered in the context of the Debtor's current and projected cash position, the proposed Adequate Protection—which the DIP Lender has

agreed to—is sufficient to protect the Lender from any diminution in value to the Prepetition Collateral.

### G. Failure to Obtain the Immediate Interim Use of Cash Collateral Would Cause Immediate and Irreparable Harm.

29.     Pursuant to Bankruptcy Rule 4001(b)(2), the Court may conduct an expedited preliminary hearing on this Motion—sooner than 15 days after this Motion's filing—and authorize the use of Cash Collateral as "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed R. Bank. P. 4001(b)(2).

49.     The Debtor have an immediate post-petition need for the use of cash provided by the DIP Loan and use of Cash Collateral.  Cash is essential for the Debtor to maintain the value of their estates during the pendency of the Case.  The Debtor will use cash to, among other things, procure goods and services from vendors, pay their employee/officer, pay for insurance, and satisfy other needs during the Case.  Without the ability to use Cash Collateral for such purposes, the Debtor will not be able to participate in the plan and sale process, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtor ability to finance their operations and the availability to the Debtor of sufficient liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the value of the Debtor's estates.

30.     The Debtor, therefore, seek immediate authority to use the Cash Collateral as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to the Debtor's estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).  Accordingly, to the extent that the Debtor require the use of Cash Collateral, the Debtor submit that they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Cash Collateral availability on

an interim basis.

**II.     The Automatic Stay Should be Modified on a Limited Basis.**

31.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Lender to file any financing statements, notice of liens, or similar instruments in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The Interim Order further provides that the automatic stay is modified and vacated to the extent necessary to permit the Lender to exercise, upon the occurrence of the Termination Date, certain rights and remedies provided for in the Interim Order.

32.     Stay modifications of this kind are ordinary and standard features of secured parties' consents to use cash collateral and, in the Debtor's business judgment, are reasonable and fair under the circumstances of the Case.  *See, e.g., In re ATP Oil and Gas* (Bankr. S.D.

Tex.); *In re CDX Gas* (Bankr. S. D. Tex.).

### REQUEST FOR FINAL HEARING

33.     67. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### SATISFACTION OF BANKRUPTCY RULES 6004(a) AND 6004(h)

68. To implement the foregoing successfully, the Debtor request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## CERTIFICATE OF NECESSITY OF
## REQUEST FOR EMERGENCY HEARING

34.     Without the DIP Loan there is no bankruptcy.

35.     If the Debtor is not permitted to use Cash Collateral, they will be forced to halt their efforts to sell, which will result in loss of the value of the business and a reduction in the value of the Debtor's enterprise and estates' assets to the detriment of the Debtor's creditors.  There would not be a successful Chapter 11 proceeding if the current motion is not considered on an expedited basis.

36.     The Debtor estimates that approximately one hour will be necessary for a hearing on this Motion and that approximately two hours may be required for a final hearing.

## **NOTICE**

37.     Notice of this Motion will be provided by overnight delivery and/or e-mail or facsimile to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) all known or alleged secured creditors; (c) the 20 largest unsecured creditors of the Debtor; (d) the DIP Lender; (e) all members of the Debtor; and (f) the Internal Revenue Service.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Respectfully submitted this 6th day of July 2016.

*/s/Leonard H. Simon*
Leonard H. Simon, Esq.
TBN: 18387400; SDOT: 8200
The Riviana Building
2777 Allen Parkway, Suite 800
Houston, Texas 77019
(713) 737-8207 (Direct)
(832) 202-2810 (Direct Fax)
lsimon@pendergraftsimon.com
**PROPOSED ATTORNEY IN CHARGE FOR DEBTOR**

**OF COUNSEL:**
William P. Haddock, Esq.
TBN: 00793875
PENDERGRAFT & SIMON
The Riviana Building
2777 Allen Parkway, Suite 800
Houston, Texas 77019
(713) 528-8555 (Main)
(713) 868-1267 (Main Fax)

## CERTIFICATE OF SERVICE

This is to certify that, on July 6, 2016, a true and correct copy of the foregoing document has been served by electronic transmission through the Court's ECF System on the parties who have made appearances and are registered to receive ECF notices in this case as of this time. Additionally, the above and foregoing motion has been served by email and/or fax on (a) the Office of the United States Trustee for the Southern District of Texas; (b) all known or alleged secured creditors; (c) the 20 largest unsecured creditors of the Debtor; (d) the DIP Lender; (e) all members of the Debtor; and (f) the Internal Revenue Service.

*/s/Leonard H. Simon*
Leonard H. Simon, Esq.