IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 16-33427 |
| COMPANION DX REFERENCE LAB, LLC | § | Chapter 11 |
| | § | |
| | § | |
| DEBTOR | § | |
| | § | |
| | § | |

**COMBINED
DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION
(PROPOSED JOINTLY BY COMPANION DX REFERENCE LAB, LLC AND
<u>THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS)</u>**

**COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION HAS BEEN SET FOR A FINAL HEARING ON APPROVAL OF THE DISCLOSURE STATEMENT AND A HEARING ON CONFIRMATION OF THE PLAN OF LIQUIDATION ON _____ __, 2016 AT _____ _.M., IN COURTROOM 404, UNITED STATES COURTHOUSE, 515 RUSK STREET, HOUSTON, TEXAS, 77002.**

**THE DISCLOSURE PROVIDED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION WAS CONDITIONALLY APPROVED BY THE COURT ON _____ __, 2016. ECF DOC. ___.**

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | THE SOLICITATION | 3 |
| III. | DEFINITIONS, RULES OF INTERPRETATION AND COMPUTATION OF TIME | 4 |
| | A. DEFINITIONS | 4 |
| | B. RULES OF INTERPRETATION | 8 |
| | C. COMPUTATION OF TIME | 8 |
| | D. INCORPORATION OF DOCUMENTS BY REFERENCE | 9 |
| IV. | DEBTOR'S HISTORY, ASSETS, LIABILITIES, LITIGATION AND MAJOR EVENTS. | 9 |
| | 1. Incorporation and Ownership | 9 |
| | 2. Management | 10 |
| | 3. Products and Services | 12 |
| | 4. Assets of Companion DX as of the Filing Date | 13 |
| | 5. Summary of Creditors and Debt as of Filing Date | 13 |
| | 6. Selected Prepetition Financial Information | 17 |
| | 7. Selected Prepetition Tax Information | 17 |
| | 8. Prepetition Litigation | 17 |
| | 9. Events Leading to Companion DX's Bankruptcy Filing. | 18 |
| V. | MAIN EVENTS IN THE BANKRUPTCY CASE | 18 |
| | A. BAR DATE | 18 |
| | B. MEETING OF CREDITORS | 19 |
| | C. APPOINTMENT OF THE COMMITTEE | 19 |
| | D. RETENTION OF PROFESSIONALS | 19 |
| | E. CERTAIN ORDERS IN THE BANKRUPTCY CASE | 19 |
| | F. SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS | 21 |
| VI. | UNCLASSIFIED CLAIMS | 22 |
| | A. ADMINISTRATIVE CLAIMS | 22 |
| VII. | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS | 24 |
| | A. CLASS 1 - ALLOWED PRIORITY NON-TAX CLAIMS | 25 |
| | B. CLASS 2 – ALLOWED SECURED CLAIMS | 25 |
| | C. CLASS 3 - ALLOWED GENERAL UNSECURED CLAIMS | 28 |
| | D. CLASS 4 – ALLOWED INTERESTS OF MEMBERS OF DEBTOR. | 28 |
| VIII. | MEANS FOR EXECUTION OF THE PLAN | 28 |
| | A. FUNDING THE PLAN | 28 |
| | B. RESERVES | 29 |
| | C. APPOINTMENT OF THE LIQUIDATING TRUSTEE | 29 |
| | 1. Appointment Of The Liquidating Trustee | 29 |
| | 2. Powers And Duties Of The Liquidating Trustee. | 29 |
| | 3. Release. | 31 |
| | 4. Monitoring, Auditing And Bonding. | 31 |
| | 5. Available Cash. | 31 |

|  |  | 6. | Compensation Of Liquidating Trustee And Compensation And Retention Of Professionals. | 31 |
|  |  | 7. | Resignation. | 31 |
|  |  | 8. | Reporting Duties. | 32 |
|  |  | 9. | Termination. | 32 |
|  | D. | | THE LIQUIDATING TRUST. | 32 |
|  |  | 1. | The CompanionDX Liquidating Trust Transfer Date. | 32 |
|  |  | 2. | Establishment of the CompanionDX Liquidating Trust. | 33 |
|  |  | 3. | Transfer of Estate Property to the CompanionDX Liquidating Trust. | 33 |
|  |  | 4. | Transfer Free and Clear of Claims. | 33 |
|  |  | 5. | Beneficiaries of the CompanionDX Liquidating Trust. | 34 |
|  |  | 6. | Distributions from the CompanionDX Liquidating Trust. | 34 |
|  |  | 7. | Dissolution of the Liquidating Trust. | 34 |
|  | E. | | THE APPOINTMENT OF THE TRUST ADVISORY BOARD | 34 |
|  |  | 1. | Establishment of the Trust Advisory Board. | 34 |
|  |  | 2. | Role of the Trust Advisory Board. | 34 |
|  |  | 3. | Termination. | 35 |
|  |  | 4. | Limitation on Liability and Exculpation. | 35 |
|  |  | 5. | Fees and Expenses of Members. | 35 |
|  |  | 6. | Retention and Payment of Professionals. | 35 |
|  | F. | | DISSOLUTION OF THE DEBTOR. | 36 |
|  | G. | | RESIGNATION OF OFFICERS AND DIRECTORS. | 36 |
| IX. | | | QUARTERLY FEES, RESERVES AND DISTRIBUTIONS | 36 |
|  | A. | | PAYMENT OF POST-CONFIRMATION QUARTERLY FEES. | 36 |
|  | B. | | PROVISIONS GOVERNING DISTRIBUTION | 36 |
|  | C. | | PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS | 37 |
| X. | | | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 38 |
|  | A. | | ENTRY OF CONFIRMATION ORDER | 38 |
|  | B. | | FINALITY OF CONFIRMATION ORDER; WAIVER | 38 |
|  | C. | | THE RESERVES | 39 |
| XI. | | | PRESERVATION OF RETAINED CLAIMS AND VESTING | 39 |
| XII. | | | TREATMENT OF EXECUTORY CONTRACTS  AND UNEXPIRED LEASES | 40 |
| XIII. | | | MODIFICATIONS AND AMENDMENTS | 40 |
| XIV. | | | RETENTION OF JURISDICTION | 40 |
| XV. | | | EFFECTS OF CONFIRMATION | 42 |
|  | A. | | BINDING EFFECT | 42 |
|  | B. | | EXCULPATION AND LIMITATION OF LIABILITY | 42 |
|  | C. | | DISCHARGE. | 42 |
| XVI. | | | MISCELLANEOUS PROVISIONS | 42 |
| XVII. | | | CONFIRMATION OF THE PLAN | 43 |
|  | A. | | VOTING PROCEDURES AND REQUIREMENTS | 43 |
|  | B. | | ACCEPTANCE | 45 |
|  | C. | | ACCEPTANCE OR REJECTION OF THE PLAN | 45 |
|  | D. | | CONFIRMATION OF THE PLAN | 45 |

  E.  THE BEST INTERESTS TEST ...........................................................................46

  F.  FEASIBILITY ....................................................................................................47

XVIII. DISCLAIMERS ..............................................................................................................47

XIX. CONCLUSION AND RECOMMENDATION ..................................................................49

EXHIBITS TO DISCLOSURE STATEMENT AND PLAN

| EXHIBITS | DESCRIPTION |
|---|---|
| Exhibit "1". | Liquidating Trust Agreement |
| Exhibit "2". | Ballot |

# I. INTRODUCTION

On or about July 5, 2016 (the "***Filing Date***"), Companion DX Reference Lab, LLC ("***Debtor***" or "***Companion DX***") filed its voluntary petition under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("***Bankruptcy Court***" or "***Court***").

This Combined Disclosure Statement and Plan of Liquidation (the "***DS/Plan***" or "***Combined DS/Plan***"), any amendments, supplements, and exhibits thereto, the accompanying Ballot form, if any, and the related materials delivered together herewith are being furnished by the Debtor to holders of Impaired Claims and Impaired Interests pursuant to § 1125,[1] in connection with the solicitation by the Debtor of votes to accept or reject the Plan and the transactions as described herein.  The Plan is proposed jointly by the Debtor and the Official Committee of Unsecured Creditors (the "***Committee***" and, together with the Debtor, the "***Proponents***") for the liquidation of the Debtor pursuant to the Bankruptcy Code.

The plan constitutes a liquidating chapter 11 plan for the Debtor.  The majority of the Debtor's tangible assets have been liquidated pursuant to the Sale.  The Sale generated approximately $65,000 in net cash proceeds plus the assumption of certain significant liabilities. The Plan provides for the use of the Sale proceeds to pay for certain Claims on the Effective Date and fund the Liquidating Trust established under the Plan for the benefit of creditors.  A Liquidating Trustee will be appointed to liquidate the remaining Assets of the Estate, including via the collection of outstanding accounts receivable and the prosecution of the claims retained under the Plan.

On the Effective Date, all of the Debtor's assets will be contributed to a Liquidating Trust and administered by the Liquidating Trustee, who will, among other things, liquidate the assets, resolve any disputed Claims, wind-down the affairs of the Debtor and the Liquidating Trust, and make distributions under the Plan.  As part of the Plan, professionals retained in the Bankruptcy Case have agreed to defer payment of a portion of their unpaid Professional Fee Claims so that approximately $50,000 can be reserved on the Effective Date to fund the expenses of the Liquidating Trust (the "***LT Funded Amount***").  The Debtor will be dissolved as soon as practicable following the establishment of the Liquidating Trust is established and funded pursuant to the Plan.  The Liquidating Trust will be dissolved as soon as practicable after the final distribution is made pursuant to the Plan.

This DS/Plan is designed to provide adequate information to enable holders of Claims against and Interests in the Debtor to make an informed decision whether to vote in favor of or against the Plan.  All Creditors and Interest holders are encouraged to read this DS/Plan in its entirety before voting to accept or reject the Plan.  The projected financial information contained herein has not been the subject of an audit, unless otherwise stated.

All holders of Impaired Claims should read and consider carefully the matters described in the DS/Plan prior to voting on the Plan.  In making a decision to accept or reject the Plan, each Creditor must rely on its own examination of the Debtor as described in this DS/Plan, including

---

[1]     All references to "§" reference the applicable section of the Bankruptcy Code.

the merits and risks involved.  You are encouraged to seek the advice of qualified legal counsel with respect to the legal effect of any aspect of the DS/Plan.  In addition, Confirmation and Consummation of the Plan are subject to conditions precedent that could lead to delays in Consummation of the Plan.  There can be no assurance that each of these conditions precedent will be satisfied or waived or that the Plan will be consummated.  Even after the Effective Date, distributions under the Plan may be subject to delay so that disputed claims can be resolved.

With the exception of historical information, future events and matters discussed herein are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such forward looking statements are subject to risks, uncertainties and other factors which could cause actual results to differ materially.

No party is authorized by the Proponents to give any information or make any representations with respect to the DS/Plan other than that which is contained herein.  No representation or information concerning the Debtor, its business or the value of its properties has been authorized by the Proponents, other than as set forth herein.  Any information or representation given to obtain your acceptance or rejection of the Plan that is different from or inconsistent with the information or representations contained herein should not be relied upon by any holders of Claims or Interests in voting on the Plan.

This DS/Plan has been prepared in accordance with § 1125 and not in accordance with federal or state securities laws or other applicable non-bankruptcy law.  Entities holding or trading in or otherwise purchasing, selling or transferring Claims against, Interests in or securities of, the Debtor should evaluate this DS/Plan only in light of the purpose for which it was prepared.

This DS/Plan has not been approved or disapproved by the Securities and Exchange Commission (the "*Commission*") or by any state securities commission or similar public, governmental or regulatory authority, and neither such Commission nor any such authority has passed upon the accuracy or adequacy of the statements contained herein.

With respect to contested matters, adversary proceedings and other pending or threatened actions (whether or not pending), this DS/Plan and the information contained herein shall not be construed as an admission or stipulation by any Entity, but rather as statements made in settlement negotiations governed by Rule 408 of the Federal Rules of Evidence and any other rule or statute of similar import.

This DS/Plan shall not be construed to be providing any legal, business, financial or tax advice.  Each holder of a Claim or Interest should, therefore, consult with its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan or the transactions contemplated thereby.

If you are a Creditor or Interest holder, you should read this Combined Disclosure Statement and Plan carefully.  The Proponents urge all holders of Claims in Impaired Classes receiving Ballots to accept the Plan as contained herein**.**

## II.    THE SOLICITATION

This DS/Plan is submitted jointly by the Debtor and the Committee to be used in

| COUNSEL FOR DEBTOR: | CO-COUNSEL FOR COMMITTEE: |
|---|---|
| Pendergraft & Simon, LLP<br>Attn: Leonard H. Simon, Esq.<br>The Riviana Building<br>2777 Allen Parkway, Suite 800<br>Houston, Texas 77019<br>Tel: (713) 737-8207 (Direct)<br>Fax: (832) 202-2810 (Direct Fax)<br>Email: lsimon@pendergraftsimon.com | Sheppard Mullin Richter & Hampton LLP<br>Attn:  Ori Katz<br>         Robert K. Sahyan<br>Four Embarcadero Center, 17th Floor<br>San Francisco, California 94111-4109<br>Tel: (415) 434-9100<br>Fax: (415) 434-3947<br>Email: okatz@sheppardmullin.com<br>         rsahyan@sheppardmullin.com<br><br>Okin Adams LLP<br>Attn: Christopher Adams<br>1113 Vine St. Suite 201<br>Houston, Texas 77002<br>Tel: (713) 228-4100<br>Fax: (888) 865-2118<br>Email: cadams@okinadams.com |

connection with the solicitation of votes on the Plan describing the terms of the liquidation of the Debtor.

The Debtor has requested that the Bankruptcy Court hold a hearing on approval of this DS/Plan to determine whether this DS/Plan contains "adequate information" in accordance with § 1125.  Pursuant to § 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, … that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant Class to make an informed judgment about the plan …."

A hearing to consider the final approval of the Disclosure Statement and confirmation of the Plan has been set for the ___ day of _____ 2016, at ____ _.m., in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas (the "*Confirmation Hearing*").

Objections to the final approval of the Disclosure Statement or objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the counsel for the Proponents listed below to ensure receipt by them on or before 5:00 p.m., on _____ __, 2016.  Bankruptcy Rule 3007 governs the form of any such objection.

## III.   DEFINITIONS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

### A.   DEFINITIONS

For purposes of this Disclosure Statement and Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article.  Any term used in this Disclosure Statement and Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.  Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

"*Administrative Claim*" or "*Administrative Priority Claim*" means a Claim that is entitled to priority under §§ 326, 327, 330, 503(b)(1) - (9), 506(c) or 1103 asserted in this case, which Claims are described and treated in Article VI.  A of this DS/Plan.

"*Administrative Claim Bar Date*" means the date by which Administrative Claims entitled to priority under §§ 326, 327, 330, 503(b), 506(c) or 1103 asserted in this case, including substantial contribution Claims, must be filed or be forever barred from asserting Administrative Claims against the Debtor and/or sharing in any distribution under the DS/Plan.   The Administrative Claim Bar Date, including with respect to Professionals Fee Claims for the period through the Effective Date, t is the thirtieth (30th) day after the Effective Date.

"*Alshalabi APA*" has the meaning assigned in Article V.F.

"*Allowed Claim*" means a Claim or any portion thereof (i) that has been allowed by a Final Order, (ii) that either has been Scheduled as a liquidated, non-contingent, undisputed Claim in an amount greater than zero in the Debtor's Schedules, as the same may from time to time be amended in accordance with the Bankruptcy Code, Bankruptcy Rules or order of the Bankruptcy Court, or is the subject of a timely filed proof of Claim as to which either no objection to its allowance has been filed (either by way of objection or amendment to the Schedules) within the periods of limitation fixed by the Bankruptcy Code or by any order of the Bankruptcy Court, or any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order, or (iii) that is expressly allowed in a liquidated amount in the Plan; provided, however that with respect to an Administrative Claim, "Allowed Claim" means an Administrative Claim as to which a timely request for payment has been made in accordance with this Plan (if such written request is required) or other Administrative Claim, in each case as to which (i) a timely objection has not been filed, or (ii) a timely objection is filed and such objection has been settled, waived through payment, or withdrawn, or has been denied by a Final Order.

"*Avoidance Actions*" means any actions commenced or that may be commenced before or after the Effective Date arising under Bankruptcy Code sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553, or under related state, federal, or foreign statutes and common law,

including, without limitation fraudulent transfer laws, whether or not litigation is commenced to prosecute such actions.

"***Ballot***" means the Ballot attached to this DS/Plan at Exhibit 2.

"***Bankruptcy Case***" means the Chapter 11 bankruptcy case commenced by the Debtor upon the filing of a voluntary petition on the Petition Date, styled *In re Companion DX Reference Lab*, *LLC*, Case No. 16-33427.

"***Bankruptcy Estate***" or "***Estate***" shall mean the estate of the Debtor created under § 541 upon the filing of the Bankruptcy Case.

"***Bankruptcy Rules***" mean, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Case or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Case or proceedings therein, as the case may be.

"***CDX APA***" has the meaning assigned in Article V. F.

"***CDX Financial***" means CDX Financial, LLC.

"***Claim***" means a claim against any of the Debtor's Bankruptcy Estate, whether or not asserted, as defined in § 101(5).

"***Class***" means a category of holders of Claims or Interests, as described in Article VII. below.

"***Committee***" means the statutory Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee in the Bankruptcy Case.

"***CompanionDX Liquidating Trust***" or "***Liquidating Trust***" means the Liquidating Trust established under the Plan pursuant to the Liquidating Trust Agreement.

"***Confirmation***" means entry by the Bankruptcy Court of the Confirmation Order confirming this Plan.

"***Confirmation Date***" means the date of entry by the Bankruptcy Court of the Confirmation Order.

"***Confirmation Hearing***" means the date set by the Court for a hearing to confirm Debtor's Plan, which has been set for the ___ day of _____ 2016, at __:00 _.m. in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas.

"***Confirmation Order***" means the order entered by the Bankruptcy Court confirming the Plan.

"***Dispute Claim Reserve***" means the Reserve established under the Plan from cash on hand and/or Other Distributable Proceeds as set forth in Article VIII. B of the Plan.

"***DS/Plan***", "***Disclosure Statement and Plan***" or "***Combined DS/Plan***" shall mean this Combined Disclosure Statement and Plan of Liquidation dated as of December 22, 2016.

"*Effective Date*" means the date when all the conditions to the occurrence of the Effective Date set forth in <u>Article X.</u> of this DS/Plan have been satisfied or waived in accordance with this DS/Plan.

"*Filing Date*" means July 5, 2016, the date when the Debtor filed this Chapter 11 proceeding.

"*Final Order*" means an order or judgment of the Bankruptcy Court, as entered on the docket in the Debtor's Bankruptcy Case, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

"*General Unsecured Claims*" means any Claims against the Debtor that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) a Priority Non-Tax Claim, (d) a Secured Claim or (e) Interests.

"*Impaired*" means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of § 1124.

"*Insider*" has the meaning set forth in 11 U.S.C. § 101(31).

"*Interest*," "*Equity Interest*" or "*Membership Interest*" means any ownership interest in the Debtor, as of the Petition Date, including, but not limited to, an interest in any issued, unissued, authorized or outstanding shares or stock and other equity security of the Debtor together with any warrants, options or contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto.

"*IRS*" means the Internal Revenue Service.

"*Liquidating Trust Agreement*" means the agreement creating the trust to be implemented pursuant to <u>Article VIII. D</u> of the Plan, which terms are consistent with the terms of the Plan. To the extent the Liquidating Trust Agreement is not filed with the Plan, it will be filed in the Bankruptcy Case prior to the Confirmation Hearing.

"*Liquidating Trustee*" means the trustee of the CompanionDX Liquidating Trust after his or her appointment pursuant to the Plan and the CompanionDX Liquidating Trust Agreement.

"*LT Funded Amount*" means the amount of $50,000 reserved on the Effective Date to fund the Liquidating Trust and shall be used to pay for expenses of the Liquidating Trust.

"*Other Distributable Proceeds*" shall mean the proceeds of the liquidation of assets of the Estate, including, but not limited to, proceeds derived from the prosecution of Retained Claims and the proceeds of the liquidation of the Accounts as described in the CDX APA.

"*Person*" means an individual, corporation, partnership, governmental unit, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

"*Plan*" means Articles III.  and IV.  through XIX.   of this DS/Plan.

"*Plan Documents*" means any documents referenced in the Plan that are intended to be executed pursuant to the Plan.

"*Plan Reserve*" means the reserve established under the Plan from cash on hand and Other Distributable Proceeds for the payment of the Allowed Claims as set forth in Article VIII.  B of the Plan.

"*Priority Non-Tax Claim*" means a Claim asserted under §§ 507(a)(3-7 and 9-10) against the Debtor's Bankruptcy Estate.

"*Priority Tax Claim*" means a Claim entitled to priority under Bankruptcy Code section 507(a)(8).

"*Professional Fee Claims*" means a Claim by any professional retained, employed or to be compensated in the Bankruptcy Case pursuant to Bankruptcy Code sections 327, 328, 330, 331 and/or 1103 for compensation for services rendered and reimbursement for expenses submitted in accordance with sections 330, 331, or 503(b) of the Bankruptcy Code for fees and expenses incurred after the Filing Date and prior to and including the Effective Date.

"*Proponents*" means, collectively, the Debtor and the Committee.

"*Purchaser*" means CDX-DIP Investment, L.L.C.

 "*Retained Claims*" shall mean all causes of action, rights, claims, and demands against any third parties, investors, individuals, or Insiders that have not been released in accordance with the terms and provisions of this Plan that the Debtor or the Bankruptcy Estate owns or has an interest in or can assert in any fashion, whether pre-petition or post-petition, including, without limitation, all litigation claims, whether such causes of action arise from contract, tort theories of liability, breach of fiduciary duty; member, manager or officer liability claims, insurance claims, statutory claims or other claims, all objections to Claims, and all adversary proceedings, all Avoidance Actions against any Person identified on the SOFA of the Debtor as a recipient of a payment made or property transferred by or on behalf of the Debtor prior to the Filing Date, claims related to the Alshalabi APA, and Claims against the Debtor's current and former directors, officers, employees, and management except as otherwise set forth herein.

"*Reserves*" means the reserves established under the Plan, consisting of the Plan Reserve and the Disputed Claims Reserve.

"*Sale*" means the sale of substantially all of the Debtor's assets to CDX-DIP Investment, L.L.C. approved by the Court's Sale Order.

"*Sale Order*" has the meaning assigned in Article V.  E.

"*Schedules*" has the meaning ascribed to such term in Article III.  D.

"**Secured Claim**" means a Claim that is secured by a valid, perfected and enforceable lien that is not subject to avoidance under bankruptcy or non-bankruptcy, but only to the extent of the value, as of the Effective Date or such later date as is established by the Bankruptcy Court, of claimant's interest in the Debtor's property securing the Claim as determined by a Final Order of the Bankruptcy Court pursuant to § 506 or as otherwise agreed upon in writing by Debtor and the holder of such Claim.

"**SOFA**" has the meaning ascribed to such term in Article III.  D.

"**Substantial Consummation**" shall have the meaning given to that term in § 1101(2). Substantial Consummation shall occur on the Effective Date.

"**Trust Advisory Board**" means the board established to serve as an advisory board of the Liquidating Trust under the terms of this Plan and the Liquidating Trust Agreement.

"**Unimpaired Claim**" means a Claim that is not an Impaired Claim.

"**Unsecured Claim**" shall mean a Claim that is not a Secured Claim and that is not entitled to priority under § 507(a)(1-9), and  includes the deficiency portions of a Secured Claim.

"**Voting Deadline**" means ____ ___, 2016, at 5:00 p.m., the deadline by which Ballots to accept or reject the Plan must be received by Debtor's counsel by in order to be counted.

## B.      RULES OF INTERPRETATION

For purposes of this Combined Disclosure Statement and Plan, (a) any reference in this Combined Disclosure Statement and Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference in this Combined Disclosure Statement and Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in this Combined Disclosure Statement and Plan to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to this Combined Disclosure Statement and Plan; (d) the words "herein" and "hereto" refer to this Combined Disclosure Statement and Plan in its entirety rather than to a particular portion of this Combined Disclosure Statement and Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Combined Disclosure Statement and Plan; and (f) the rules of construction set forth in § 102 and in the Bankruptcy Rules shall apply.

## C.      COMPUTATION OF TIME

All times referenced in this Disclosure Statement and Plan are prevailing Central Time. In computing any period of time prescribed or allowed by this Combined Disclosure Statement and Plan, the provisions of Fed. R. Bankr. P. 9006(a) shall apply.

**D.      INCORPORATION OF DOCUMENTS BY REFERENCE**

This DS/Plan incorporates by reference certain documents relating to the Debtor that are not presented herein or delivered herewith.  The documents that have been filed in the Debtor's Bankruptcy Case are incorporated by reference herein in their entirety, including all amendments thereto filed prior to the date set for confirmation, including the following documents: (a) the Debtor's Schedules of Assets and Liabilities ("***Schedules***") filed on July 19 2016 [ECF Doc. 51]; and Statement of Financial Affairs ("***SOFA***") filed on July 19, 2016 [ECF Doc. 52].  Documents and pleadings filed in this case are available at the following website: http://www.txsb.uscourts.gov/.

## IV.      DEBTOR'S HISTORY, ASSETS, LIABILITIES, LITIGATION AND MAJOR EVENTS.

The information in this Article IV.   is from documents filed by the Debtor in the Bankruptcy Case.

**1.      Incorporation and Ownership**

Companion DX is a limited liability company organized under the laws of the State of Texas on June 29, 2011.  Companion DX is a laboratory testing facility involved in the following advanced testing techniques.

The current members of CompanionDx are as follows:

| TABLE 1 | | |
|---|---|---|
| **NAME OF MEMBER** | **CLASS/NUMBER** | **100%** |
| NCMLAB, LLC/Steve S. Harter<br>1224 N. Post Oak Rd, Suite 105<br>Houston, TX 77055 | Class B Voting<br>575 Units | 4.2% |
| R. L. Crosby Interests (Roddie Lee)<br>7670 Woodway Dr., Suite 375<br>Houston, TX 77063 | Class B Voting<br>1681 Units | 12.3% |
| Steve Blum<br>2004 Fairview St<br>Houston, TX 77019 | Class B Voting<br>1681 Units | 12.3% |
| David Philip Kapiloff<br>419 Thamer Lane<br>Houston, TX 77024 | Class B Voting<br>1681 Units | 12.3% |

| TABLE 1 | | |
|---|---|---|
| **NAME OF MEMBER** | **CLASS/NUMBER** | **100%** |
| Kriter LLC/Kevin Paul Rosenblatt<br>4909 Valerie St.<br>Bellaire, TX 77401 | Class B Voting<br>3362 Units | 24.7% |
| Michael Stewart<br>2801 Waterwall Dr, Apt 603<br>Houston, TX 77056 | Class B Voting<br>2921 Units | 21.4% |
| W. Tim Sexton<br>26 Crestwood Dr<br>Houston, TX 77007 | Class A Voting<br>500 Units | 3.7% |
| Felix B. Maduro, c/o Agencias<br>Feduro SA, Anevidas Ricardo J.<br>Alfaro y Miguel Brostello #36<br>Panama City, Republic of Panama | Class A Voting<br>125 Units | 0.9% |
| KCW Corp. (KC Weiner)<br>Texas Crude Energy,<br>2803 Buffalo Speedway<br>Houston, TX 77098 | Class A Voting<br>500 Units | 3.7% |
| KNA Partners - John Beeson<br>550 Waugh Drive<br>Houston, TX 77019 | Class A Voting<br>250 Units | 1.8% |
| Charles Singletary<br>4913 Westview Drive<br>Austin, TX 78731 | Class B Voting<br>200 Units | 1.5% |
| David Putska<br>3394 Chevy Chase Dr<br>Houston, TX 77019 | Class A Voting<br>100 Units | 0.7% |
| Lipper Investments, LP<br>Hirsch & Westheimer<br>Bank of America Center<br>700 Louisiana, 25th Floor<br>Houston, TX 77002 | Class A Voting<br>50 Units | 0.4% |

2.    **Management**

As of the Filing Date, Debtor's management consists of the following individuals:

| | |
|---|---|
| Michael Stewart, Chief Executive Officer and Director | Mr. Stewart is an investor and has been involved in numerous businesses. He graduated from Rice University in 1965 with a BS in Physics and a Masters Degree in physics. |
| H. Rey Stroube, IV, Chief Financial Officer | Bachelor of Science, Business Administration with Special Attainments in Commerce, Washington and Lee University – Lexington, Virginia, graduating in 1991. Mr. Stroube is a certified public accountant ("CPA"), liensed in the State of Texas, and is certified as a turnaround professional ("CTP"). Mr. Stroube has been with the company since June of 2012. |
| Kevin Rosenblatt, Chief Medical Officer. | Dr. Rosenblatt a practicing Anatomic Pathologist. Dr. Rosenblatt graduated from University of Texas Southwestern Medical Center at Dallas Southwestern Medical School in 2000 and has been in practice for 15 years. |
| Steven Blum, Executive Vice President and Director | Mr. Blum is a founder and has been involved in numerous businesses. He graduated from the University of Wisconsin – Oshkosh with a Bachelor of Business Administration in 1982. |
| Prem Gurnani, Vice President, Product Marketing and Chief Technology Officer | Prem Gurnani earned his M.S. in biomedical engineering from UT Arlington/UT Southwestern Medical Center. He is a trained scientific professional, entrepreneur and consultant with more than seven years of proficiency in the field of biomedical research, design, development and support. |
| Mehdi Dehghani<br><br>Assistant Clinical Laboratory Director | Dr. Dehghani received his PhD in clinical biochemistry from Shiraz University, and completed his post-doctoral research fellowship at the University of Texas. He is a clinical scientist with over ten years of training in biochemistry and molecular diagnostics, and has extensive background in cancer biology, cell signaling, and Pharmacogenomics. |
| Sitara Waidyaratne, Vice President, Clinical Laboratory Operations | Sitara Waidyaratne is a highly accomplished and results-driven clinical laboratory executive, with proven expertise in molecular testing and an unparalleled track record. Sitara has over 15 years of clinical operations experience in both diagnostic and hospital settings, working alongside many clinical professionals. She was a Senior Scientist at Quest Diagnostics prior to joining CompanionDx. |

| Prem Gurnani, Vice President, Product Marketing and Chief Technology Officer | Prem Gurnani earned his M.S. in biomedical engineering from UT Arlington/UT Southwestern Medical Center. He is a trained scientific professional, entrepreneur and consultant with more than seven years of proficiency in the field of biomedical research, design, development and support. |
|---|---|

Following the Filing Date, the Debtor retained Wayne Fuquay as its Chief Restructuring Officer.

**3.    Products and Services**

The following is a brief description of the products and services that the Debtor offered prior to the Sale:

a.    **Next-Generation Sequencing ("*NGS*")**.    An advanced DNA sequencing technology that allows the rapid sequencing of large stretches of DNA base pairs spanning the entire genome, NGS accurately detects cancer-specific mutations in very early neoplastic cells before morphological changes are apparent.

The NGS evaluates the key characteristics of the patient's tumor.  The test is completed via a biopsy sample to evaluate the tumor's DNA.  NGS is conducted to analyze somatic mutations that may affect how a patient responds to a treatment plan.

NGS provides a patient's tumor molecular profile and identifies resistance mechanisms present in an evolving tumor.  It provides familial genetic testing of cancers, and targeted therapies to patients with specific mutations.

b.    **Pharmacogenomics Testing ("*PGx*")**.  Pharmacogenomics is the study of how genes affect a person's response to drugs.  PGx evaluates the patient's metabolic profile, the potential drug/gene and drug/drug interactions.  This test establishes a clear understanding of the patient's potential drug/gene and drug/drug interaction.  Starting with a buccal swab, PGx is conducted to analyze germline variants that may affect how a patient responds to certain drugs.  The test identifies patient-specific metabolism for CYP2D6, CYP2C9, CYP2C19, CYP3A4/3A5, CYP1A2, VKORC1, DPYD, TPMT, UGT1A1, Factor II, Factor V, MTHFR, SLCO1B1 and TYMS.  The PGx report will reveal if a patient is an ultrarapid, extensive, intermediate or poor metabolizer of relevant drugs.

c.    **Therapeutic Drug Monitoring**.  Medical doctors require diagnostic solutions that improve clinical management of patients.  The Debtor was a leading diagnostic and medical decision support company that provided practitioners with medication monitoring.  To achieve this, the Debtor used the latest drug screening technologies that confirms patient compliance with drug regimens, detection of medication duplications (e.g., opiates) and detection of illicit drug use.  Used in combination with the company's pharmacogenomics testing,

medication monitoring enabled the optimization of drug dosing and the minimization of drug interactions.

    **d.**    **Certifications and Accreditations**.  Under the Clinical Laboratory Improvement Amendments ("*CLIA*"), 42 U.S.C. §263a, laboratory testing facilities are required to be certificated by their state before they can accept human samples for diagnostic testing.  The Debtor was certified by the CLIA as well as by the State of Texas, State of California, New York State, and the State of Florida, as well as other states to conduct testing.  The Debtor has also received its accreditation from the College of American Pathologists ("*CAP*").

**4.**    **Assets of Companion DX as of the Filing Date**

| ASSETS | VALUE[2] |
|---|---|
| Cash | $11,507.00 |
| Deposits and Prepayments | $49,528.94 |
| Accounts Receivable (Net) | $1,100,223.00 |
| Investments in Non-Operating Subs | $30.00 |
| Lab Supplies | $484,273.00 |
| Office Furniture | $75,000.00 |
| Office Equipment | $40,000.00 |
| Lab Equipment | $1,804,825.00 |
| Intangibles and Intellectual Property | $50.00 |
| TOTAL: | $3,565,436.94 |
| Law Suit Insurance Claim | $68,000.00 |
| Claim against Novatas | $8,500,000.00 |
| Chapter 5 Claims | Unknown |

**5.**    **Summary of Creditors and Debt as of Filing Date**

    The description of Claims in the Plan does not necessarily imply that the Claim is an Allowed Claim.  All Claims and the validity and/or extent of any Liens securing any Claims are subject to further investigation and analysis and, depending on the conclusion of such analysis, may be subject to an objection.

    **Secured Debt:**

    The original capitalization of the Debtor was accomplished by five investors referred to as founders (the "*Founders*") loaning substantial sums of money to the Debtor (the "*Founder's Notes*"), secured all of the Debtor's assets.  On September 25, 2012, the original five Founders were granted liens and security interests in the Debtor to secure the following original capitalization loans:

---

[2]Value is as asserted by the Debtor as of the Filing Date.

| TABLE 4 | | | |
|---|---|---|---|
| **NAME OF FOUNDERS** | **ORIGINAL AMOUNT INVESTED AS SECURED LOAN** | **PAYMENTS RECEIVED** | **CURRENT BALANCE** |
| Rod L. Crosby | $339,353.00 | | $339,353.00 |
| Steve Blum | $100,000.00 | | $100,000.00 |
| David Philip Kapiloff | $439,153.00 | | $439,153.00 |
| Kevin Paul Rosenblatt | $200,000.00 | | $200,000.00 |
| Steve Harter | $3,895,000.00 | $3,394,296.00 | $500,704.00 |

**The 2013 Dispute Arose Over Management and Control.**  In February 2013, a dispute among the Founders over management and control of the Debtor came to a head.  Steve Harter was by far the largest investor in the Debtor, and held 50% of the Membership Interests in the Debtor, but his membership certificates gave him 100% voting control.   The other 50% Membership Interests held by the other four Founders were non-voting in nature.   Michael Stewart, the Debtor's Chief Executive Officer, was brought in to resolve the management dispute, and helped negotiate a transaction with Harter whereby the Debtor agreed to repay Harter's $3,895,000.00 secured capitalization loan, and Harter relinquished his Membership Interest in the Debtor.  From April to June 2013, the Debtor raised additional capital in the amount of $3,450,000, $1,000,000 of which was used to make the first payment on Harter's $3,895,000.00 secured capitalization loan.   Harter's loan continued to be secured by a first priority lien and security interest in all of the Debtor's assets until repaid in full.  Over the next two years, Harter's loan was paid down $3,394,296.  The current balance is $500,704.  The pay-down on the Harter loan also came from proceeds of loans made to the Debtor from two of the Remaining Founders and other investors, including Michael Stewart, as follows:

| TABLE 5 | | | |
|---|---|---|---|
| **NAME OF LENDER** | **AMOUNT OF UNSECURED LOAN** | **PAYMENTS RECEIVED** | **CURRENT BALANCE** |
| Rod L. Crosby | $1,500,000.00 | $00.00 | $1,500,000.00 |
| David P.  Kapiloff | $1,500,000.00 | $00.00 | $1,500,000.00 |
| Michael Stewart | $1,500,000.00 | $00.00 | $1,500,000.00 |
| Tim Sexton | $500,000.00 | $00.00 | $500,000.00 |

| TABLE 5 | | | |
|---|---|---|---|
| **NAME OF LENDER** | **AMOUNT OF UNSECURED LOAN** | **PAYMENTS RECEIVED** | **CURRENT BALANCE** |
| Charles Singletary | $250,000.00 | $00.00 | $250,000.00 |
| David Putska | $200,000.00 | $00.00 | $200,000.00 |
| **TOTAL:** | $5,450,000.00 | | $5,450,000.00 |

The **2016 CDX Financial Loan.**  On February 4, 2016, CDX Financial, LLC ("**CDX Financial**") made a $2,500,000,00 loan to the Debtor secured by a lien and security interest in all assets of the Debtor (the "**CDX $2,500,000.00 Loan Facility**"), pursuant which the remaining founders, Rod L. Crosby, Steve Blum, David P.  Kapiloff and Kevin Rosenblatt (the "**Remaining Founders**"), subordinated the liens and security interests securing their Founder Notes to the liens and security interests granted to secure the CDX $2,500,000.00 Loan Facility.  Thereafter, during the months of April – June 2016, CDX Financial loaned an additional $795,000 to the Debtor (the "**CDX Financial Supplemental Loan**"), but three of the four Remaining Founders, Rod L. Crosby, David P.  Kapiloff and Kevin Rosenblatt, did not subordinate the liens and security interests securing their Founder Notes to the CDX Financial Supplemental Loan.  The CDX Financial financing is presented graphically below:

| TABLE 6 | | | |
|---|---|---|---|
| **NAME OF LENDER** | **CDX FINANCIAL SECURED LOANS** | **PAYMENTS RECEIVED** | **CURRENT BALANCE** |
| Rod L. Crosby | $165,000.00 | $00.00 | $165,000.00 |
| David P.  Kapiloff | $365,000.00 | $00.00 | $365,000.00 |
| Michael Stewart | $822,000.00 | $00.00 | $822,000.00 |
| Tim Sexton | $390,000.00 | $00.00 | $390,000.00 |
| KCW Corp. – KC Weiner | $1,170,000.00 | $00.00 | $1,170,000.00 |
| KNA Partners – John Beeson | $100,000.00 | $00.00 | $100,000.00 |
| Charles Singletary | $100,000.00 | $00.00 | $100,000.00 |
| David Putska | $200,000.00 | $00.00 | $200,000.00 |
| **TOTAL:** | $3,312,000.00 | | $3,312,000.00 |

Thus the following is a graphic presentation of the total prepetition secured creditors of the Debtor (the "***Prepetition Secured Creditors***"), not including capital lease obligations:

| TABLE 7 | | |
|---|---|---|
| **SECURED CREDITOR** | **CURRENT BALANCE** | **PRIORITY** |
| Steve Harter | $500,704.00 | First Lien |
| CDX Financial | $2,500,000.00 | Second Lien |
| Remaining Founders | $1,078,506.00 | Third Lien |
| CDX Financial Supplemental Loan | $822,000.00 | Fourth Lien[3] |
| TOTAL | $4,901,210.00 | |

**Capital Lease Secured Obligations**

| CAPITAL LEASES | COLLATERAL | AMOUNT OWED | VALUE OF COLLATERAL |
|---|---|---|---|
| CIT Finance LLC | Two BS-480 Chemistry Analyzers | $164,753.00 | $50,000.00 |
| Corporation Service Company | Biomek FXP Single Multichannel | $56,146.00 | $2,472,178.00 |
| De Lage Landen Financial | Waters XEVO TQ-System | $212,107.00 | $204,000.00 |
| Forum Financial Services, Inc. | Tecan Freedom Evo 200 (2); Tecan N | $107,046.34 | $127,000.00 |
| MB Financial Bank, NA | QuantStudio 12K Flex | $1,662.11 | $142,500.00 |
| MB Financial Bank, NA | Three (3) ViiA7 384-Well Instruments | $1,412.89 | $0.00 |
| Navitas Lease Corp. | Two (2) LCMS-8050 CL's and Peripherals | $506,794.00 | $500,000.00 |
| ThermoFisher Financial | 3730XL 96W with SW | $102,969.00 | $177,500.00 |
| ThermoFisher Financial | QuantStudio, PGM, ViiA7, 96W Block and ION Rep | $50,398.00 | $0.00 |
| TOTAL: | | $1,203,288.34 | $3,673,178.00 |

**Priority Unsecured Debt.**

As set forth in the Debtor's Schedule E, the total Unsecured Priority Debt is $136,694.73. Most of such amount is on account of prepetition wage-related claims against the Debtor.

---

[3] As of the Filing Date, Michael Stewart and KC Weiner disputed that CDX Financial was in the fourth position with respect to the CDX Financial Supplemental Loan.

Pursuant to its order entered on the docket on July 8, 2016, the Court authorized the Debtor to pay $135,069.36 for employee related claims and taxes.  ECF Document No. 22.  Thereafter, the Debtor paid such amounts approved in such order.

**Unsecured Debt.**

As set forth Table 5, above, there were certain unsecured loans made by members of the Debtor in the amount of $5,450,000.00.  In addition, the unsecured prepetition trade debt is $3,659,324 if excluding royalties or $4,184,324 if including royalties.   This does not include estimated "Honorarium" obligations in the approximate amount of $1,000,000.00. The  Debtor's Schedule F indicates that the total Unsecured Debt is $10,929,154.11, and that there are 936 creditors.

**6.      Selected Prepetition Financial Information**

|  | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 4/31/2016 |
|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | |
| **Revenues** | $7,784,104 | $16,495,090 | $37,241,049 | $49,164,700 | $1,534,200 |
| **Cost of Sales** | $3,955,363 | $5,670,499 | $11,626,791 | $16,382,412 | $1,146,647 |
| **Gross Profit/Loss** | $3,828,741 | $10,824,591 | $ 25,614,258 | $32,782,288 | $755,738 |
| **Net Income/Loss** | ($827,821) | ($2,288,261) | $1,676,632 | ($6,782,767) | ($2,639,757) |
| **BALANCE SHEET** | | | | | |
| **Total Assets** | $7,081,465 | $6,315,296 | $17,947,723 | $6,785,377 | |
| **Total Liabilities** | $7,909,286 | $7,603,557 | $16,271,091 | $13,568,144 | |
| **Net Worth** | $7,081,465 | $5,315,296 | $17,947,723 | $6,785,377 | |

**7.      Selected Prepetition Tax Information**

|  | 2013 1065 | 2014 1065 |
|---|---|---|
| **Gross Receipts or Sales** | 11,687,328 | 26,406,081 |
| **Cost of Goods Sold** | 5,519,923 | 9,015,798 |
| **Gross Profit/Loss** | 6,166,343 | 17,390,283 |
| **Total Income (Loss)** | 6,065,686 | 16,962,609 |
| **Total Deductions** | 8,803,361 | 18,049,732 |
| **Ordinary Income (Loss)** | (2,737,675) | (1,087,123) |

**8.      Prepetition Litigation**

On or about February 15, 2012, the Debtor entered into a Services Agreement with XIFIN, Inc.  Pursuant to the agreement, XIFIN was to provide billing and claims processing for

the Debtor commencing on or about February 15, 2012, for a forty eight month period. Debtor ultimately declined to renew the contract with XIFIN. XIFIN filed suit against the Debtor in California to recover amounts it claims are due under the terminated contract. Debtor asserted counterclaims against XIFIN.

Information about other litigation is provided in Paragraph 7 of Part 3 of the SOFA, which is incorporated here by this reference.

9.      **Events Leading to Companion DX's Bankruptcy Filing.**

Companion entered the marketplace at a time when Pharmacogenomic (PGx) testing was on the rise and when testing approval and reasonable payment amounts could be secured.  In fact, Debtor's business model was established to capture favorable profit margins that existed in connection with this cutting edge testing.  However, in early 2013, the Centers for Medicare & Medicaid Services (CMS) introduced a policy directing individual Medicare Administrative Contractors (MACs) around the United States to individually determine coverage policy.  The MAC governing Texas, Novitas, Inc., did not cover the testing, but approached CompanionDx to develop and execute a "Registry" (similar to a clinical trial), which was designed to prove clinical utility for Pharmacogenomic testing.  CompanionDx launched the Registry in mid-2014 and rapidly increased sales by the end of that year.  However, in early 2015, Novitas canceled the Registry and claimed that the trial was not executed properly.  At around the same time period, CMS and the MACs imposed new and significantly restrictive changes for Pharmacogenomic laboratory testing.  Medicare began denying coverage for the majority of such testing that it had reimbursed since 2009.  As a result, as few as 1% of Medicare patients were covered for testing (down from approximately 50%).  Once Medicare, Medicaid and affiliated MACs cut rates, some insurance companies followed suit.  This has forced many labs in this space to re-evaluate their business strategy.

To address this problem, Companion DX altered its business plan, as follows: While still marketing PGx, the Company established a Toxicology Lab, which provides urine-based drug testing.  This business grew modestly.  As an offshoot from this technology, CompanionDx developed a "blood-based" toxicology test, called Therapeutic Drug Monitoring (TDM), which tests for drugs in the blood.  This technology looked to have a promising market acceptance.

In addition, Companion established itself as a "reference lab", which performs tests for other labs and particularly hospitals.  Hospitals generally are "in-network" for most private insurance companies, so reimbursement is more reliable for them.  CompanionDx was paid at a lower rate, but did not have the billing expense, and was reimbursed for every test.

Ultimately, the Debtor's financial difficulties proved unmanageable and the Debtor determined to seek bankruptcy relief.

V.      **MAIN EVENTS IN THE BANKRUPTCY CASE**

A.      **BAR DATE**

**NOTICE IS HEREBY GIVEN THAT THE COURT HAS SET AS THE BAR DATES IN THIS CASE <u>NOVEMBER 21, 2016</u>, THE DEADLINE WITHIN WHICH**

NON-GOVERNMENTAL PROOFS OF CLAIM OR INTERESTS MUST BE FILED, AND <u>JANUARY 9, 2017</u>, THE DEADLINE WITHIN WHICH GOVERNMENTAL PROOFS OF CLAIM MUST BE FILED.  FAILURE TO FILE A PROOF OF CLAIM OR INTEREST REQUIRED BY THE BANKRUPTCY CODE OR BANKRUPTCY RULES BY THE BAR DATE MAY RESULT IN YOUR CLAIM OR INTEREST IN THIS CHAPTER 11 PROCEEDING BEING <u>DISALLOWED</u>.  PLEASE FILE YOUR PROOFS OF CLAIM OR INTEREST THROUGH AN ATTORNEY ELECTRONICALLY, OR BY MAIL ADDRESSED TO: DAVID J. BRADLEY, CLERK OF COURT, P. O.  BOX 61010, HOUSTON, TEXAS 77208.

**B.    MEETING OF CREDITORS**

The Court set the 341 meeting of creditors for August 22, 2016, at 3:00 p.m.

**C.    APPOINTMENT OF THE COMMITTEE**

On July 28, 2016 the United States Trustee for the Southern District of Texas filed the Amended Notice of Appointment of Committee of Unsecured Creditors, appointing the Committee.  The Committee was appointed to represent the interests of unsecured creditors of the Debtor pursuant to section 1102 of the Bankruptcy Code.  The Committee members are XIFIN, Inc.; Quadax, Inc.; and Path-Tec, LLC.

**D.    RETENTION OF PROFESSIONALS**

On July 8, 2016, Debtor filed its Application to Employ Pendergraft & Simon, LLP as its bankruptcy counsel.  Said application was approved by the Court pursuant to its order entered on August 5, 2016.  ECF doc.  100.

On August 2, 2016, Debtor filed an Expedited Application to Employ Chief Restructuring Officer, Wayne Fuquay.  Said application was approved by the Court on August 11, 2016.  ECF Doc.  124.

On August 31, 2016, the Committee filed its application to retain Sheppard, Mullin Richter & Hampton LLP as its main bankruptcy counsel and its application to retain Okin Adams LLP as its local counsel.  Said applications were granted by the Court pursuant to its orders entered on September 26, 2016.  ECF Doc.  217 and 216, respectively.

**E.    CERTAIN ORDERS IN THE BANKRUPTCY CASE**

On July 8, 2016, the Court entered an Order Granting Complex Chapter 11 Bankruptcy Case Treatment.  ECF Doc.  18.

On July 8, 2016, the Court entered an Order (i) Authorizing Continued Use of Existing Business Forms and Records; (ii) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System; and (iii) Waiving the Requirements of 11 U.S.C. § 345(b).  ECF Doc.  23.

On July 8, 2016, the Court entered an Interim Finance and Cash Collateral Order.  ECF Doc. 25.

On July 21, 2016, the Court entered an Order Extending Interim Financing and Cash Collateral. ECF Doc. 57.

On July 21, 2016, the Court entered an Order Granting Motion for Authority to Sell Assets of the Estate Free and Clear of Liens, Claims and Encumbrances, and to Deposit the Proceeds into the DIP Escrow Account. ECF Doc. 58.

On July 30, 2016, the Debtor filed ten Omnibus Motions to Reject Executory.  ECF Document Nos. 72-81 and 98.  Orders granting the motions were entered on September 1, 2016. ECF Doc. 153-163.

On August 22, 2016, the Court entered an Order Granting Expedited Motion for Order Approving (I) Letter of Intent and Purchaser Protection Provisions, (II) Sale Procedure and Form of Notice, and (III) Certain Bid Protections. ECF Doc. 138. (the "***Bid Procedures Order***").

On September 22, 2016, the Court entered its Order Granting Motion, Pursuant to Bankruptcy Code Sections 105(A), 363, and 365 For Entry of an Order: (A) Approving Purchase Agreement, (B) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (C) Approving the Assumption and Assignment Of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief.  ECF Doc. 209 (the "***Over-Bidder Sale Order***").

On October 24, 2016, the Court entered its Fourth Order Extending Interim Financing and Cash Collateral Order.  ECF Doc. 230.

On October 27, 2016, the Court entered its Order Granting Motion, Pursuant To Bankruptcy Code Sections 105(a), 363, And 365 For Entry Of An Order: (A) Approving Purchase Agreement, (B) Authorizing Sale Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests, (C) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (D) Granting Related Relief. ECF Doc. 239. (the "***Sale Order***").

On November 17, 2016, the Court entered its Order Regarding Assumption and Assignment To Purchaser of Certain Executory Contracts. ECF Doc. 250 (the "***Assumption Order***").

**THESE PLEADING CAN BE ACCESSED THROUGH THE PACER ELECTRONIC CASE FILING SYSTEM FOR THE SOUTHERN DISTRICT OF TEXAS, WITH A PACER ACCOUNT WHICH CAN BE PURCHASED AT HTTP://PACER.PSC.USCOURTS.GOV.  THE WEBSITE ADDRESS FOR THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS IS: HTTP://WWW.TXSB.USCOURTS.GOV**

**F.      SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS**

On August 23, 2016, this Court entered the Bid Procedures Order.  Pursuant to the Bid Procedures approved in the order, potential bidders were given an opportunity to participate in the sale process and submit a bid in accordance with the Bid Procedures (such bid is referred to as a "Qualified Bid").  Pursuant to the Bid Procedures, an auction was conducted at 1:00 p.m.  on September 15, 2016 in the Conference Room outside the Court's courtroom on the 4th Floor of the Federal Court Building, 515 Rusk, Houston, Texas 77002.  The overbid provided by Fadel Alshalabi was the highest bid made at the auction (the "***Alshalabi APA***").  Following the auction, the Court conducted a hearing, finding that that the "Successful Bidder" was Fadel Alshalabi, by and through a to-be-formed corporation, limited liability company or partnership affiliated with Mr. Alshalabi.

The Alshalabi APA was approved by the Court pursuant to the Over-Bidder Sale Order.  However, after the entry of the Over-Bidder Sale Order, Alshalabi failed to close and defaulted under the Alshalabi APA.

Following the default by Alshalabi under the Alshalabi APA, the Debtor negotiated an asset purchase agreement (the "***CDX APA***") with the stalking horse bidder for the sale of substantially all of Debtor's assets (the "***Sale***") to CDX-DIP Investment, L.L.C. (the "***Purchaser***").  The Court approved such Sale on the terms of the CDX APA pursuant to the Sale Order.

The "Purchase Price" under the CDX APA is $2,000,000, divided into $200,000 paid in cash (defined there as the "***$200,000 Estate Cash***") and the balance in the form of assumed liabilities.  The $200,000 Estate Cash was received by Debtor less certain credits given under the CDX APA in the approximate amount of $120,000.  The balance of the $200,000 Estate Cash may be used to pay the Allowed Administrative Claims.

Additionally, the CDX APA provided for the sharing by the Estate and the Purchaser of the proceeds collected under the accounts receivable of the Debtor sold to Purchaser (defined in the CDX APA as "***Accounts***").  In that regard, the CDX APA provides as follows:

(3)      After the Closing Date, 100% of the proceeds of the Accounts, net of direct reasonable collection costs, shall be used to pay the following amounts and in the following order:

(i)      up to $100,000 to the Bankruptcy Estate to replenish the $200,000 Estate Cash depleted as a result of the Purchaser Credits (as [] defined [in the CDX APA]);

(ii)      $630,000 to the Purchaser, and

(iii)      $120,000 to the Bankruptcy Estate.

(4)      Thereafter, 20% of the proceeds of the Accounts collected …, net of direct reasonable collection costs, shall be paid to Seller's Bankruptcy Estate or the liquidating trust established under the Confirmed Chapter 11 Plan of Reorganization, as appropriate; and 80% of the proceeds of the Accounts collected …, net of direct reasonable collection costs, shall be paid to the Purchaser.

Reference to the CDX APA should be made for the full terms of the Sale, which terms are incorporated here as if fully set forth herein.

## VI.   UNCLASSIFIED CLAIMS

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified under the Plan, and the treatment of those Claims is set forth herein.

## A.   ADMINISTRATIVE CLAIMS

As provided under Bankruptcy Code section 1123(a)(1), Administrative Claims are not classified for purposes of voting on, or receiving distributions under, the Plan.  Accordingly, holders of Administrative Claims are not entitled to vote on this Plan.

### 1 – PROFESSIONAL FEE CLAIMS

**Description**.  All Professional Fee Claims.  A summary of these claims are as follows:

| Claimant | Estimated Fees and Expenses Through _____, 2016 |
|---|---|
| Wayne Fuquay, the Debtor's CRO | |
| Pendergraft & Simon, LLP, Counsel for the Debtor | |
| Sheppard Mullin Richter & Hampton LLP – Primary Counsel for the Committee | |
| Okin Adams LLP – Local Counsel for the Committee | |

**Treatment**.  Subject to the terms of the paragraph immediately below this paragraph, the Professional Fee Claims listed above shall be paid in full out of the Reserves or from other available sources on the later of the Effective Date or the date such Professional Fee Claim becomes an Allowed Claim.  The holders of the Professional Fee Claims shall file and serve an application for final allowance of compensation and reimbursement of expenses no later than the thirtieth (30th) day after the Effective Date.

Notwithstanding the foregoing, to the extent the Reserves contain insufficient funds on the Effective Date to fund the LT Funded Amount and pay all Allowed Administrative Claims in full, each professional shall receive the following on account of its Allowed Professional Fee Claim: (a) if funds remain available after funding the LT Funded Amount and making the payments required to be made on the Effective Date under the Plan, an initial payment to each such professional, made as soon as practicable following

entry of the Final Order approving such professional's fee award, to the extent not previously paid by the Debtor (inclusive of any retainers), consisting of a pro rata share of the aggregate amount allocated in the Reserves on the Effective Date for the payment of Professional Fee Claims (based on good faith determination of the Proponents); and (b) thereafter, when additional funds are first available, including from Other Distributable Proceeds, a pro rata share of such additional funds until all Allowed Professional Fee Claims are paid in full, and until such Allowed Professional Fee Claims are paid in full, they shall rank in right of payment *pari passu* with the fees and expenses over the LT Funded Amount of the Liquidating Trust and Liquidating Trustee. The Debtor is informed and believes that all the professionals have agreed to the foregoing treatment and will be bound by such agreement under the Plan.

## 2 – U.S. TRUSTEE QUARTERLY FEES

**Description.** The U.S. Trustee Quarterly Fees assessed pursuant to 28 U.S.C. § 1930(a)(6). The following is the estimate of such fees:



| United States Trustee – 4th Quarter Estimate | |
|---|---|

The Debtor's Bankruptcy Estate shall be responsible for timely payment of the United States Trustee quarterly fees incurred pursuant to § 1930(a)(6) without the need for the Office of the United States Trustee to file any request for payment. Any such fees due as of the Confirmation Date will be paid in full on the Effective Date of the Plan out of the Plan Reserve. The Liquidating Trustee shall timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) out of available funds until such time as the Bankruptcy Court enters a final decree closing this chapter 11 case, or enters an order either converting this case to a case under chapter 7 or dismissing this case. After confirmation, the Liquidating Trustee shall file with the Bankruptcy Court and shall transmit to the United States Trustee a true and correct statement of all disbursements made by the Liquidating Trustee for each quarter, or portion thereof that this chapter 11 case remains open in a format prescribed by the United States Trustee.

## 3 – ALL OTHER ADMINISTRATIVE CLAIMS

**Description**. All Administrative Claims other than Professional Fee Claims and fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930. All holders of such Claims must timely file such Claims by the Administrative Claim Bar Date or be forever barred from asserting Administrative Claims against the Debtor and/or sharing in any distribution under the DS/Plan.

**Treatment**. To the extent such Allowed Administrative Claims have not already been paid, satisfied or otherwise released prior to the Effective Date, and except to the extent that a holder of an Allowed Administrative Claim agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive cash in an amount equal to such Allowed Claim, in full and final satisfaction, settlement and release and in exchange for

such Claim, on the later of the Effective Date or the date such Administrative Claim becomes an Allowed Administrative Claim pursuant to a Final Order of the Bankruptcy Court, or as soon thereafter as reasonably practicable.

## 4 – ALLOWED PRIORITY TAX CLAIMS

**Description**.  The Priority Tax Claims listed on Schedule E of the Debtor's Schedules and/or filed in the Bankruptcy Case.

**Treatment**.  To the extent that the holders of Allowed Priority Tax Claims have not already been paid, satisfied or otherwise released prior to the Effective Date, and except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, the holder of such Allowed Priority Tax Claim shall receive on the later of the Effective Date or the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement and release and in exchange for such claim, an amount in cash equal to the unpaid amount of such Allowed Priority Tax Claim, which may be paid through deferred cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored general unsecured claim provided for by the Plan

## VII.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

All Claims and Interests are placed in the Classes set forth below.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled.

| Class | DESCRIPTION | VOTING |
|---|---|---|
| CLASS 1 | PRIORITY NON-TAX CLAIMS | UNIMPAIRED, DEEMED TO ACCEPT |
| CLASS 2 | SUBCLASS 2A (SECURED CLAIM OF STEVE HARTER) | UNIMPAIRED, DEEMED TO ACCEPT |
|  | SUBCLASS 2B (SECURED CLAIM OF CDX FINANCIAL) | UNIMPAIRED, DEEMED TO ACCEPT |
|  | SUBCLASS 2C (SECURED CLAIMS OF THE REMAINING FOUNDERS) | UNIMPAIRED, DEEMED TO ACCEPT |

| | SUBCLASS 2D (OTHER SECURED CLAIMS) | UNIMPAIRED, DEEMED TO ACCEPT |
|---|---|---|
| CLASS 3 | GENERAL UNSECURED CLAIMS | IMPAIRED, ENTITLED TO VOTE |
| CLASS 4 | INTERESTS | IMPAIRED, DEEMED TO REJECT |

## A.   CLASS 1 - ALLOWED PRIORITY NON-TAX CLAIMS

**Description**.  Class 1 consists of the Allowed Priority Non-Tax Claims.

**Treatment**.  Each Allowed Priority Non-Tax Claim in this Class shall be paid in full on the later of the Effective Date or the date such Priority Non-Tax Claim becomes an Allowed Claim.

**Voting**.  Class 1 is not Impaired.  Holders of Class 1 Priority Non-Tax Claims are deemed to have accepted this Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

## B.   CLASS 2 – ALLOWED SECURED CLAIMS

1.   Subclass 2A:

**Description**.  Subclass 2A consists of the Secured Claim of Steve Harter described in Table 7 of Article IV, which was asserted in a first lien position on collateral pledged by the Debtor.

**Treatment**.  The Subclass 2A Claim is satisfied in full pursuant to the applicable terms described in CDX APA in connection with the Sale and the holder of the Subclass 2A shall not be entitled to receive any further distribution under the Plan.  The treatment of the Subclass 2A Allowed Claim described herein shall be in full settlement and satisfaction of the Subclass 2A Allowed Claim.

**Voting**.  Subclass 2A is not Impaired.  Holder of Subclass 2A Secured Claim is deemed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f) and is not entitled to vote on the Plan.

2.   Subclass 2B:

**Description**.  Subclass 2B consists of the Secured Claim of CDX Financial described in Table 7 of Article IV, asserted in the amount of $2,500,000 in second lien position and $822,000 in fourth lien position on collateral pledged by the Debtor.

**Treatment**.  Pursuant to the CDX APA and in connection with the Sale, $903,000 of the Subclass 2B Claim was assumed by the Purchaser (defined in the CDX APA as the

"***CDX Financial Assumed Debt***"), with the balance (defined in the CDX APA as the "***CDX Financial Non-Assumed Debt***") continued to be secured by the collateral pledged by the Debtor to the extent set forth in the CDX APA, which provides in relevant parts as follows:

> The CDX Financial Non-Assumed Debt "shall remain a lien on assets not purchased and which are owned by Seller, if any, and shall remain a claim in the Bankruptcy Case, provided, however, the CDX Financial Non-Assumed Debt shall not remain a lien on the Estate Cash, the Claims described in paragraph 2.2(b) of [the CDX APA] and their proceeds, the Avoidance Actions described in paragraph 2.2(d) of [the CDX APA] and their proceeds, the D&O Insurance described in paragraph 2.2(e) of [the CDX APA], the deposit under the cancelled transaction with Fadel Alshalabi, and the Accounts and their proceeds; and provided, further, the CDX Financial Assumed Debt and CDX Financial Non-Assumed Debt shall remain a lien on the Accounts in the form of the CDX Assumed Lien, but only to the extent provided for in 2.2(m) of this [the CDX APA]."

> …..

> "If and to the extent that CDX Financial LLC exercises its rights and remedies with respect to its CDX Assumed Lien on the Accounts related to the CDX Financial Assumed Debt and the CDX Financial Non-Assumed Debt, such exercise shall (i) be subject to the approval of the [Liquidating] Trustee or the Bankruptcy Court and (ii) accrue to the collective benefit of CDX Financial, LLC and the Debtor's Bankruptcy Estate in accordance with the provisions above [described in the CDX APA], including the priority distributions and the 80/20 distribution set forth above [described in the CDX APA]."

Except to the extent that the holder of an Allowed Subclass 2B Claim agrees to a different treatment, such holder shall receive on or as soon as reasonably practical after the Effective Date, in full and final satisfaction, settlement, release and discharge of, and in exchange for such Allowed Subclass 2B Claim, the following:  Holder of Allowed Subclass 2B Claim shall retain its lien on the assets of the Estate to the extent and in the priority provided in the CDX APA and subject to the terms thereof, which are incorporated herein, and, shall receive payment on account of its Allowed Subclass 2B Claim from the proceeds of the Accounts allocated to the Purchaser under the CDX APA in accordance with a separate arrangement between the holder of Subclass 2B Claim and the Purchaser.  For clarity, no distributions shall be made on account of the Allowed Subclass 2B Claim from proceeds of the Accounts allocated to the Bankruptcy Estate under the CDX APA or other recoveries obtained by the Liquidating Trust.

**Voting**.  Subclass 2B is not Impaired.  Holder of Subclass 2B Secured Claim is deemed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f) and is not entitled to vote on the Plan.

3.      <u>Subclass 2C</u>:

**<u>Description</u>**.  Subclass 2C consists of the Secured Claims of the Remaining Founders described in Table 7 of <u>Article IV</u>, asserted in the aggregate amount of $1,078,506 in third lien position on collateral pledged by the Debtor.  Because the Sale stripped such lien, there is no collateral of any significant value that remains, and Subclass 2C is believed to be completely undersecured.

**<u>Treatment</u>**.  Except to the extent that the holder of an Allowed Subclass 2C Claim agrees to a different treatment, such holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Subclass 2C Claim, the following treatment as soon as reasonably practical on or after the Effective Date: Holder of Subclass 2C Claim's legal, equitable, and contractual rights remain unchanged with respect to its collateral, if any.  The confirmation order will constitute an order for relief from stay.  The creditor in Subclass 2C shall retain its interest in the collateral until paid in full.  Any deficiency amount on account of the Subclass 2C Claim shall be treated as a Class 3 Claim.

The treatment of the Subclass 2C Allowed Claims described herein shall be in full settlement and satisfaction of the Subclass 2C Allowed Claim.

**<u>Voting</u>**.  Subclass 2C is not Impaired.  Holder of Subclass 2C Secured Claim is deemed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f) and is not entitled to vote on the Plan.

4.      <u>Subclass 2D</u>:

**<u>Description</u>**.  Subclass 2D consists of the Secured Claims other than the Secured Claims classified in Subclasses 2A through 2C.  Because the Sale stripped the lien securing such Claims, there is no collateral of any significant value that remains, and Subclass 2D is believed to be completely undersecured.

**<u>Treatment</u>**.  Except to the extent that the holder of an Allowed Subclass 2D Claim agrees to a different treatment, such holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Subclass 2D Claim, the following treatment as soon as reasonably practical on or after the Effective Date: Holder of Subclass 2D Claim's legal, equitable, and contractual rights remain unchanged with respect to its collateral, if any.  The confirmation order will constitute an order for relief from stay.  The creditor in Subclass 2D shall retain its interest in the collateral until paid in full.  Any deficiency amount on account of the Subclass 2D Claim shall be treated as a Class 3 Claim.

**<u>Voting</u>**.  Subclass 2D is not Impaired.  Holder of Subclass 2D Secured Claim is deemed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f) and is not entitled to vote on the Plan.

C.      **CLASS 3 - ALLOWED GENERAL UNSECURED CLAIMS**

**Description**.  Class 3 consists of the Allowed General Unsecured Claims, and includes the Claims of the creditors for (i) any deficiency portions of any of Secured Claims and (ii) any Claim arising out of the rejection of executory contracts and unexpired leases under, if any.

**Treatment**.  Except to the extent that the holder of an Allowed Class 3 Claim agrees to a different treatment, such holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Class 3 Claim, the following treatment as soon as reasonably practical on or after the Effective Date:  The Allowed Claims of General Unsecured Creditors in this Class 3 shall be satisfied, on a pro rata basis, from distribution of the Reserves and/or Other Distributable Proceeds available after the satisfaction in full of the accrued fees and expenses of the Liquidating Trust, Administrative Claims, accrued amounts due to holders of Priority Tax Claims, and Priority Non-Tax Claims.  Class 3 claimants will be entitled to interest as allowed by law and determined by the Court prior to any distribution to creditors in Class 4.

**Voting**.  Class 3 is Impaired.  Holders of Class 3 Claims are entitled to vote on the Plan.

D.      **CLASS 4 – ALLOWED INTERESTS OF MEMBERS OF DEBTOR.**

**Description**.  Class 4 consists of the Allowed Interests of the Debtor's members.

**Treatment**.  Upon the Effective Date, Interests in the Debtor shall be deemed cancelled, provided, however, holders of Interests shall be entitled to receive a pro rata distribution of proceeds remaining in the Reserves and/or Other Distributable Proceeds after payment in full of the fees and expenses of the Liquidating Trust, Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Claims in Class 3.

**Voting**.  Class 4 is Impaired.  Holders of Class 4 Interests are deemed to reject the Plan under Section 1126(g) of the Bankruptcy Code and not entitled to vote on the Plan.

### VIII.   MEANS FOR EXECUTION OF THE PLAN

A.      **FUNDING THE PLAN**

The Plan is a liquidating plan and shall be funded with (i) the cash on hand in the Bankruptcy Estate as of the Effective Date, consisting for the balance amount remaining from the $200,000 Estate Cash, (ii) the proceeds of the Accounts collected by the Liquidating Trustee as described in the CDX APA and this Plan, (iii) and from the liquidation and monetization of all other assets, including the Retained Claims, and proceeds thereof as well as any other remaining assets that may be liquidated or otherwise monetized and/or Claims that may be recovered for the benefit of the Bankruptcy Estate.

**B.     RESERVES**

As soon as practicable after the Confirmation Date, the following reserves shall be established (the "*Reserves*"):

1.     <u>Plan Reserve</u>.  The Plan Reserve shall be established and funded from cash on hand and/or Other Distributable Proceeds in an amount sufficient to pay and/or reserve for the Administrative Claims (including Professional Fee Claims but subject to the concession provided by the professionals to defer the balance of their Professional Fee Claims as described in the treatment provided in the Plan for such Claims), Priority Tax Claims, the portion of the Priority Non-Tax Claims due on the Effective Date or soon thereafter, and an amount necessary to fund the costs of the Liquidating Trustee and the CompanionDX Liquidating Trust as reasonably determined by the Proponents.  The LT Funded Amount shall be reserved in the Plan Reserve for the payment of the expenses of the Liquidating Trust.

2.     <u>Disputed Claims Reserve</u>.  The Disputed Claims Reserve shall be established as set forth in <u>Article IX.  C</u> of this Plan and funded from the cash on hand and/or Other Distributable Proceeds.

The Reserves shall be funded with cash on hand and Other Distributable Proceeds.

**C.     APPOINTMENT OF THE LIQUIDATING TRUSTEE**

**1.     Appointment Of The Liquidating Trustee**

There will be one Liquidating Trustee under the Plan who will be vested with all the powers of a debtor-in-possession and Chapter 11 trustee.  The Committee shall, prior to the Confirmation Date, nominate the initial Liquidating Trustee.  The Liquidating Trustee candidate shall be approved at the Confirmation Hearing, and shall thereafter immediately undertake the required duties under the Plan.  The appointment of the Liquidating Trustee to be effective as of the Effective Date.

The selection of any successor Liquidating Trustee shall be made by the Trust Advisory Board.  Subject to the oversight of the Trust Advisory Board, the Liquidating Trustee shall be empowered to act on behalf of the CompanionDX Liquidating Trust and to carry out the provisions of this Plan.  The Liquidating Trustee shall not have an interest that is materially adverse to the Debtor, the Bankruptcy Estate, or the CompanionDX Liquidating Trust.

**2.     Powers And Duties Of The Liquidating Trustee.**

The Liquidating Trustee shall be deemed to possess the same powers and duties as would a Chapter 11 Trustee consistent with Section 1123(b)(3)(B) of the Bankruptcy Code.  On the Effective Date, the Liquidating Trustee shall receive into the Liquidating Trust all unadministered property of the Bankruptcy Estate of any kind and nature whatsoever, real, personal, intellectual or otherwise, including causes of action, and all proceeds thereof, and any books and records of the Debtor, including any attorney-client privilege, work product privilege, or other privilege or immunity in connection therewith.  The Liquidating Trustee shall be

empowered and authorized to take or cause to be taken all actions which in his judgment are necessary to secure the effective implementation of the Plan, subject to the oversight of the Trust Advisory Board.  The Liquidating Trustee will receive all Retained Claims.  The Liquidating Trustee shall also be empowered to file claims objections as to all Claims (the "Claims Objections").  The Liquidating Trustee will be a representative of the Debtor's Bankruptcy Estate pursuant to Bankruptcy Code section 1123(b)(3) and as such will have the power to prosecute and defend, the Retained Claims and the Claims Objections.  In that regard, the Liquidating Trustee shall have the power and authority to perform the following acts:

1.  Distribute available proceeds, including those in the Reserve and/or Other Distributable Proceeds, as specified in Articles VI.   and VII.  of the Combined DS/Plan;

2.  Establish any necessary reserves, including the Plan Reserve and the Disputed Claims Reserve;

3.  Open bank accounts, deposit proceeds and draw checks and make disbursements thereof;

4.  Employ and have such attorneys, accountants, and clerical assistance as may be deemed necessary;

5.  Pay and discharge any costs, expenses, fees or obligations incurred by the Liquidating Trustee as are necessary to liquidated any assets of the Bankruptcy Estate, including pursuing the Retained Claims and prosecuting the Claims Objections as provided for herein;

6.  Take any action required or permitted by the Plan;

7.  Sue and be sued with respect to the Retained Claims and the Claims Objections;

8.  Settle, compromise or adjust by arbitration, mediation or otherwise, any Retained Claim or any of the Claims Objections;

9.  Enforce the rights under the Accounts for the benefit of the Bankruptcy Estate, and subject to the terms of the CDX APA, including designate the party(ies) responsible for the collection of the Accounts as described therein;

10.  Update and consult with the Trust Advisory Board regarding the implementation of the Plan; and

11.  In general, without in any manner limiting any of the foregoing, take any action that would be lawful for any person having the duties and responsibilities described in this Plan, whether similar to or different from the ways above specified.

3.      **Release.**

The Liquidating Trustee will be released and indemnified for all obligations and liabilities of the Debtor, save and except those duties and obligations of the Liquidating Trustee set forth in the Plan and those attributable to the gross negligence or willful misconduct of the Liquidating Trustee.

4.      **Monitoring, Auditing And Bonding.**

The Liquidating Trustee will not be required to post bond or be audited or monitored except as otherwise expressly provided herein.

5.      **Available Cash.**

All funds collected by the Liquidating Trustee and maintained pending distribution, shall be deposited with a bank approved by the Office of the United States Trustee as an approved entity for maintenance of debtor- in-possession bank accounts.

6.      **Compensation Of Liquidating Trustee And Compensation And Retention Of Professionals.**

1.      The Liquidating Trustee shall be entitled to receive compensation for services rendered, which compensation shall be agreed with the Proponents and disclosed in a filing with the Court, provided that such compensation shall not be paid from the proceeds of the Accounts allocated to the Purchaser unless the Purchaser, the Liquidating Trustee and the Trust Advisory Board agree, or alternatively the Bankruptcy Court determines, that the Liquidating Trustee's fees are direct and reasonable expenses incurred in collecting such proceeds. The Liquidating Trustee may receive such compensation without the need for filing fee applications under the Bankruptcy Code or for prior Bankruptcy Court approval but subject to ten (10) prior notice to the Trust Advisory Board. To the extent the Board objects to such fees and expenses, the Trustee shall seek Court approval.

2.      The Liquidating Trustee may retain agents and professionals. Unless provided for otherwise herein, the fees and costs incurred by the agents and professionals of the Liquidating Trustee shall be paid not more frequently than on a monthly basis, out of cash reserved for that purpose by the Liquidating Trustee. Those agents and professionals retained by the Committee shall be deemed approved agents and professionals of the Liquidating Trustee on the Effective Date. The professionals may receive such compensation without the need for filing fee applications under the Bankruptcy Code or for prior Bankruptcy Court approval but subject to ten (10) prior notice to the Trust Advisory Board. To the extent the Board objects to such fees and expenses, the Trustee shall seek Court approval.

7.      **Resignation.**

The Liquidating Trustee may resign as such by an instrument in writing signed by the Liquidating Trustee and filed with the Bankruptcy Court, provided that the Liquidating Trustee

will continue to serve as Liquidating Trustee after his resignation until the time when appointment of his successor shall become effective.  The Liquidating Trustee may be removed by the Trust Advisory Board in its sole and absolute discretion for any or no reason, with or without cause.  In addition, any creditor or interest holder has the right to petition the Bankruptcy Court to remove the Liquidating Trustee for cause as outlined in section 324 of the Bankruptcy Code.   In the event of the death, resignation, incompetency, or removal of the Liquidating Trustee, the Trust Advisory Board or upon order of the Bankruptcy Court following a hearing may appoint a successor Liquidating Trustee.  Every successor Liquidating Trustee appointed shall execute, acknowledge and deliver to the Bankruptcy Court and the retiring Liquidating Trustee an instrument accepting such appointment, and thereupon such successor Liquidating Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers and duties of the retiring Liquidating Trustee.

**8.       Reporting Duties.**

Forty-five (45) days after the end of each calendar quarter following confirmation, the Liquidating Trustee will file with the Court an unaudited written report and account showing (i) the assets and liabilities at the end of such quarter or upon termination, (ii) any changes in the assets which have not been previously reported, and (iii) any material action taken by the Liquidating Trustee in the performance of his or her duties under the under the Plan that has not been previously reported, and (iv) fees of professionals and the Liquidating Trustee.  In addition, the Liquidating Trustee shall provide to the Trust Advisory Board such reports on the progress of the Plan, as may be reasonably requested by the Trust Advisory Board.

**9.       Termination.**

The Liquidating Trustee shall continue to perform his duties until all proceeds in the Reserves under the Plan and/or Other Distributable Proceeds have been fully distributed and all assets of the Bankruptcy Estate, including Retained Claims and Claims Objections, have been fully liquidated.  The Liquidating Trustee shall pay all accrued but unpaid fees and expenses of the Liquidating Trustee and his professionals, file a Motion to Close the Chapter 11 Case with the Bankruptcy Court, providing notice of same to the Creditors and Interest holders, and distribute any remaining cash in the possession of the Liquidating Trustee in accordance with the terms and provisions of Articles VI.  and VII.   of the this Combined DS/Plan.

**D.       THE LIQUIDATING TRUST**

**1.       The CompanionDX Liquidating Trust Transfer Date.**

On the Effective Date (such time referred to as the "***Liquidating Trust Transfer Date***"), any unadministered property of the Bankruptcy Estate of any kind and nature whatsoever, real, personal, intellectual or otherwise, including causes of action, and all proceeds thereof, and any books and records of the Debtor, including any attorney-client privilege, work product privilege, or other privilege or immunity in connection therewith (the "***Liquidating Trust Assets***") shall be transferred to the Liquidating Trust, as provided below, which shall be deemed to be the Liquidating Trust Transfer Date, for further disposition as provided in this Plan and the Liquidating Trust Agreement.

2.      **Establishment of the CompanionDX Liquidating Trust.**

On the Liquidating Trust Transfer Date, the Liquidating Trust Agreement shall be executed, creating the CompanionDX Liquidating Trust.  The CompanionDX Liquidating Trust shall be established for the sole purpose of receiving the benefit of the ongoing obligations of third parties and liquidating and distributing the remaining assets of the Bankruptcy Estate in accordance with this Plan with no objective to continue or engage in the conduct of a trade or business.   For all federal income tax purposes, all parties shall treat the CompanionDX Liquidating Trust as a liquidating trust pursuant to Treasury Regulations § 301.7701-4(d), and as a grantor trust subject to the provisions of Subchapter J, Part I, Subpart E of the Internal Revenue Code of 1986, as amended, owned by the Beneficiaries (defined below) of the CompanionDX Liquidating Trust as grantors.  The affairs and administration of the CompanionDX Liquidating Trust shall be governed by this Plan, the Confirmation Order, the CompanionDX Liquidating Trust Agreement, any other Final Orders, and applicable bankruptcy and non-bankruptcy law. The CompanionDX Liquidating Trust and the Liquidating Trustee shall be vested with all the power and authority granted to a trustee pursuant to section 1106(a) of the Bankruptcy Code.

3.      **Transfer of Estate Property to the CompanionDX Liquidating Trust.**

On the Liquidating Trust Transfer Date and after the execution of the Liquidating Trust Agreement, all the Liquidating Trust Assets shall be transferred to the CompanionDX Liquidating Trust.  The CompanionDX Liquidating Trust shall hold the Liquidating Trust Assets in its exclusive possession, custody and control for the benefit of holders of Claims entitled to payment under this Plan.  For all federal income tax purposes, the Bankruptcy Estate shall treat the transfer of all of the Liquidating Trust Assets to the CompanionDX Liquidating Trust as a transfer to holders of Claims to the extent such holders are Beneficiaries of the CompanionDX Liquidating Trust.  The Liquidating Trustee shall ensure that, for all federal income tax purposes, consistent valuations are used by the Liquidating Trustee and the holders of Claims for all property transferred to the CompanionDX Liquidating Trust.

4.      **Transfer Free and Clear of Claims.**

All Liquidating Trust Assets transferred to the CompanionDX Liquidating Trust shall be free and clear of all Claims, interests, Liens and encumbrances, and such property shall remain as property of the CompanionDX Liquidating Trust until distributed pursuant to this Plan.  On the Liquidating Trust Transfer Date, a stay of all actions to the same extent as set forth in section 362(a) of the Bankruptcy Code with respect to the Bankruptcy Estate, the CompanionDX Liquidating Trust, and the Liquidating Trustee shall be and remain in effect pending consummation of this Plan.  The transfer of assets to the CompanionDX Liquidating Trustee pursuant to this section shall not constitute a default or breach under or result in any forfeiture whatsoever with respect to any asset or property interest transferred to the CompanionDX Liquidating Trust.

5.      **Beneficiaries of the CompanionDX Liquidating Trust.**

Upon creation of the CompanionDX Liquidating Trust, holders of Claims in Class 3 (holders of Allowed General Unsecured Claims) shall be Beneficiaries of the CompanionDX Liquidating Trust.

6.      **Distributions from the CompanionDX Liquidating Trust.**

The Liquidating Trustee may make interim Distributions to Beneficiaries of the Liquidating Trust in the exercise of reasonable business judgment after consultation with the Trust Advisory Board.  Upon the liquidation of any remaining assets of the estate, and after the payment of all costs and expenses of collection, the Liquidating Trustee must distribute the corpus of the CompanionDX Liquidating Trust to the Beneficiaries of the CompanionDX Liquidating Trust in accordance with their priority and percentage interests in the Liquidating Trust.   In the event that all Allowed Claims of the Beneficiaries of the CompanionDX Liquidating Trust are paid in full, with interest, then any remaining cash shall become Available Cash under the Plan.

7.      **Dissolution of the Liquidating Trust.**

Except as otherwise provided in the Liquidating Trust Agreement, upon the distribution to the Beneficiaries of the CompanionDX Liquidating Trust of all of the rest of the CompanionDX Liquidating Trust, the Liquidating Trustee shall file a notice of final distribution with the Court.  Upon the expiration of thirty (30) days after the filing of such notice, if no objection has been received then the CompanionDX Liquidating Trust shall terminate and the Liquidating Trustee shall be discharged.

E.      **THE APPOINTMENT OF THE TRUST ADVISORY BOARD**

1.      **Establishment of the Trust Advisory Board.**

On the Effective Date, the Trust Advisory Board shall be established and staffed by no more than three (3) holders of Allowed Class 3 Claims.  The Trust Advisory Board may adopt such bylaws as it may deem appropriate; provided, however, that no provision of any adopted bylaws shall supersede any express provision of the Plan.  The Trust Advisory Board shall initially consist of the current members of the Committee, provided that such members shall be authorized to resign at any time if elected to do so.

2.      **Role of the Trust Advisory Board.**

The Trust Advisory Board shall be appointed to consult with and advise the Liquidating Trustee from time to time regarding the administration of the Liquidating Trust in accordance with the provisions of the Plan and the Liquidating Trust Agreement.  The members of the Trust Advisory Board shall act in the best interests of the Beneficiaries of the Liquidating Trust.

Subject to and in accordance with the provisions of the Plan, the Confirmation Order, the Liquidating Trust Agreement and any other Final Order of the Bankruptcy Court, the Trust Advisory Board shall have right to seek relief from the Bankruptcy Court regarding any specific

action taken or proposed to be taken by the Liquidating Trustee with respect to the Plan, the Liquidating Trust Agreement, the Liquidating Trust, or the Liquidating Trust Assets.

**3.      Termination.**

The Trust Advisory Board will remain in existence until the earlier of the termination of the Liquidating Trust or completion of distributions to holders of Allowed Class 3 Claims.

**4.      Limitation on Liability and Exculpation.**

Neither the members of the Trust Advisory Board nor the representatives or agents of such members shall be liable for actions taken or omitted in their capacity as, or on behalf of, the Trust Advisory Board, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Trust Advisory Board, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts.  Any indemnification claim under this section shall be satisfied from the Liquidating Trust Assets and any insurance coverages procured by the Liquidating Trustee on behalf of the Liquidating Trust.  The Trust Advisory Board shall be entitled to rely, in good faith, on the advice of its retained professionals.

**5.      Fees and Expenses of Members.**

Members of the Trust Advisory Board shall be entitled to reimbursement of reasonable and necessary expenses incurred in carrying out their duties as members of the Trust Advisory Board, all of which shall be paid from the Liquidating Trust without the need to file an application with the Bankruptcy Court.  Such expenses shall be paid from available funds in the Liquidating Trust.  Members of the Trust Advisory Board shall not be entitled to compensation for time spent on the Trust Advisory Board.

**6.      Retention and Payment of Professionals.**

On or after the Effective Date, the Trust Advisory Board may retain such professionals (including, without limitation, attorneys and accountants) as may be deemed necessary or desirable by the Trust Advisory Board to assist and advise the Trust Advisory Board for purposes of carrying out the Trust Advisory Board's functions as specified under the Plan, provided that the  Liquidating Trustee and the Trust Advisory Board may jointly retain the same professional(s) to represent their joint interest, and provided further that other professionals(s) may be retained by only the Trust Advisory Board if the Liquidating Trustee's prior written approval or, alternatively, the approval of the Bankruptcy Court, of such retention is obtained only to the extent the fees and costs of any such professional(s) proposed to be retained by the Trust Advisory Board are to be paid from the Liquidating Trust Assets.  The Trust Advisory Board may retain professionals who represented parties in interest in the Bankruptcy Case.  Any professionals retained by the Trust Advisory Board in accordance with the foregoing shall not be required to file a fee application to receive compensation.

**F.      DISSOLUTION OF THE DEBTOR.**

As of the Effective Date, or as soon thereafter as reasonably practicable, the Liquidating Trustee shall be authorized to dissolve the Debtor and file any applicable certificate of dissolution and/or other applicable document in the applicable state(s) of incorporation for the Debtor, which may be executed by the Liquidating Trustee without need for approval by the Debtor's officers, directors or holders of Interests or need for compliance with non-bankruptcy law, and at such time the Debtor shall thereby dissolve and cease to exist.

**G.      RESIGNATION OF OFFICERS AND DIRECTORS.**

Upon the Effective Date, the members of the Debtor's board of directors and the officers of Debtor shall be deemed to have resigned, without further action. Upon the Effective Date, the Liquidating Trustee shall be empowered and authorized to act on behalf of the Debtor and to take all such actions and measures as necessary to implement the Plan, which actions or measures would otherwise be taken by an officer or a director of the Debtor.

**IX.      QUARTERLY FEES, RESERVES AND DISTRIBUTIONS**

**A.      PAYMENT OF POST-CONFIRMATION QUARTERLY FEES.**

The Liquidating Trustee shall continue to report to the UST regarding post-confirmation distributions made by the Bankruptcy Estate so that the UST can determine the fees incurred pursuant to 28 U.S.C. §1930(a)(6), and timely pay same until the clerk of the Court closes the Chapter 11 Case.

**B.      PROVISIONS GOVERNING DISTRIBUTION**

1.    **Distributions**.  Any payments or distributions to be made by the Liquidating Trustee pursuant to the Plan shall be made to the holders of Allowed Claims in accordance with the terms and provisions of Articles VI.  and VII.  of this Combined DS/Plan.

2.    **Means of Cash Payment**.  Payments of Cash to be made by the Liquidating Trustee pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

3.    **Delivery of Distributions**.  Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth on the proofs of claim filed by such holders (or at the last known addresses of such holders if no proof of Claim is filed); or if the Liquidating Trustee has been notified of a change of address, at the address set forth in such notice.

4.    **Time Bar to Cash Payments**.  Checks issued by the Liquidating Trustee in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of delivery thereof.  Requests for reissuance of any check shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of such a voided

check shall be made on or before the later of the first anniversary of the Effective Date or ninety (90) days after the date of delivery of such check. After such date, the unclaimed property held on account of such voided check or such Claim shall vest in the Bankruptcy Estate free and clear of all claims and interests and shall be made available for distribution to the other holders of Allowed Claims in accordance with the Plan.

## C.   PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS

1.   **Objection Deadline**.  Unless a different date is set by order of the Bankruptcy Court, all objections to Claims shall be served and filed no later than ninety (90) days after the Effective Date or twenty (20) days after a particular proof of Claim is filed, whichever is later; provided, however that such deadline may be extended pursuant to a motion filed with the Court by the Liquidating Trustee.  Any proof of Claim filed after the Bar Date or for Deficiency Claims or Rejection Claims, after the deadline for filing such claims set forth in this Plan shall be of no force and effect, shall be deemed disallowed, and will not require objection.  All contested Claims shall be litigated to Final Order, *provided, however*, that the Liquidating Trustee may compromise and settle any contested Claim by following a Settlement Notice with respect to such settlement in accordance with the procedures described in Article XI. of the Plan.

2.   **Responsibility for Objecting to Claims**.  Until the Effective Date, all parties identified by the Bankruptcy Rules may file objections to Claims.  From and after the Effective Date, the Liquidating Trustee shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to claims, including without limitation, any objections to claims filed by the Debtor prior to the Effective Date.

3.   **No Distribution Pending Allowance**.  Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any contested Claim unless and until such contested Claim becomes an Allowed Claim.  A reserve for the amount of the contested Claim shall be maintained until the Claim is decided.

4.   **Administration of Contested Claims**.

   (a)   **Disputed Claims Reserve**.  In determining the amount of distributions to be made under the Plan to holders of Allowed Claims, the appropriate distributions required by the Plan shall be made according to estimates and subject to the provisions of the Plan.  To protect the interests of holders of contested Claims, the contested Claims Reserve shall be established on the Effective Date.  The Liquidating Trustee shall fund the contested Claims Reserve with Cash in an amount that represents the Pro Rata Share of the Cash that would otherwise be distributed to holders of contested Claims if such Claims were Allowed.

(b)    **Distribution After Allowance**.  As soon as practicable after a contested Claim becomes an Allowed Claim, the holder of an Allowed Claim shall receive a distribution in an amount equal to the aggregate of all the distributions that such holder would have received had such contested Claim been an Allowed Claim on the Effective Date.  Distributions to each holder of a contested Claim, to the extent that such Claim becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such Claim belongs.  The Liquidating Trustee shall have the right to make or direct the making of all interim distributions to the holders of Allowed Claims.  No interest shall be paid on account of a contested Claim that later becomes an Allowed Claim.

(c)    **Distribution After Disallowance**.  If and when a contested Claim becomes a Disallowed Claim, the Pro Rata Share of the distributions to which each holder is entitled shall increase commensurately.  Accordingly, the Liquidating Trustee, in his sole discretion, shall have the right to make or direct the making of any subsequent distributions.

## X.      CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

The occurrence of each of the following events shall be a separate condition to the Effective Date, which conditions may be waived, in whole or in part, by agreement of the Debtor and the Committee, in writing, at any time without notice, or by an order of the Bankruptcy Court.

## A.      ENTRY OF CONFIRMATION ORDER

The Confirmation Order shall have been signed by the Court and duly entered on the Court's docket in form and substance acceptable to the Debtor and the Committee, and shall include, among other things, findings of fact and/or conclusions of law that:

1.      approve the terms of the Plan, as it may be amended or modified, and all other agreements contemplated by the Plan;

2.      reserve the jurisdiction of the Bankruptcy Court in accordance with <u>Article XIV.  </u>, below; and

3.      provide, pursuant to § 1125(e), that persons who have solicited acceptances or rejections of the Plan have acted in good faith and in compliance with the provisions, and are not liable on account of such solicitation or participation for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

## B.      FINALITY OF CONFIRMATION ORDER; WAIVER

The Confirmation Order, in form and substance satisfactory to Debtor and the Committee shall either have become a Final Order, or such condition shall have been waived by an agreement of the Debtor and the Committee.

C.      **THE RESERVES**

The Reserves to be established under the Plan have been funded in accordance with the Plan.

## XI.     PRESERVATION OF RETAINED CLAIMS AND VESTING

*Vesting*.  The Bankruptcy Estate shall remain open after Confirmation of the Plan (a) to permit the Liquidating Trustee to prosecute all Retained Claims, including Avoidance Actions and other lawsuits of the Bankruptcy Estate, to final conclusion, (b) to permit the Liquidating Trustee in interest to prosecute to conclusion all claims objections, (c) to permit the Liquidating Trustee to liquidate the assets not sold pursuant to the Sale, and (d) and to make final distributions to all creditors as provided for in this Plan, including the U.S. Trustee fees through the closing of the case.

*Retention and Enforcement of Causes of Action.*  Except as otherwise provided in the Plan, all causes of action that the Debtor and its estates may hold against any person or entity shall be retained by the Debtor's Bankruptcy Estate among the Retained Claims and shall be investigated and may be prosecuted by the Liquidating Trustee after the Effective Date.  Any creditor that is subject to an avoidance action may have an unsecured claim if and to the extent any transfer is returned to the Debtor's Bankruptcy Estate.

The investigation into the Retained Claims has not been completed.  Accordingly, any and all Retained Claims that may exist against any person or entity may be pursued by the Liquidating Trustee, regardless of whether, or the manner in which, such Retained Claims are identified in the DS/Plan.  The failure to identify a Retained Claim in the DS/Plan shall not constitute a waiver or release of any such Retained Claim.

Any and all Retained Claims shall survive entry of the Confirmation Order for the benefit of the Debtor's Bankruptcy Estate and, on and after the Effective Date, for the benefit of the Liquidating Trust and its beneficiaries.

*Settlement of Retained Claims and Objections to Claims*.  After the Confirmation Date, the Liquidating Trustee shall be authorized to settle and compromise any and all Retained Claims and any objections to Claims, after consultation with the Trust Advisory Board if the amount in controversy exceeds $25,000, by filing a notice of settlement with the Bankruptcy Court and the applicable settlement entered into between the Liquidating Trustee and a defendant or holder of a claim (a "**Settlement Notice**").  The Debtor shall serve a copy of the Settlement Notice on the Trust Advisory Board, the twenty largest Unsecured Creditors and any parties requesting notice in the Debtor's Bankruptcy case by email.  If no party files an objection to the Settlement Notice within ten (10) days after the Settlement Notice is filed, the proposed settlement shall be deemed approved without further order of the Court.  If an objection to the Settlement Notice is timely filed, the Liquidating Trustee shall set the matter for hearing and seek court approval of the Settlement.

## XII.   TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

Under § 365, the Debtor has the right, subject to Bankruptcy Court approval, to assume or reject any executory contracts or unexpired leases.  If the Debtor rejects an executory contract or unexpired lease that was entered into before the Filing Date, it will be treated as if it had been breached on the date immediately preceding the Filing Date, and the other party to the agreement may assert a General Unsecured Claim in Class 3 for damages incurred as a result of the rejection.  In the case of rejection of employment agreements and real property leases, damages are subject to certain limitations imposed by applicable sections of the Bankruptcy Code.  Debtor is unaware of any contracts that need to be rejected under the Plan.

The Plan constitutes a motion to reject any executory contracts to which the Debtor is a party listed on Amended Bankruptcy Schedule G and not otherwise assumed or subject to a pending assumption motion or rejected pursuant to a Final Order.  If the rejection by the Debtor pursuant to the Plan or otherwise of an executory contract or unexpired lease results in a Claim that is not theretofore evidenced by a timely proof of Claim or a proof of Claim that is deemed to be filed timely under applicable law, then such Claim will be forever barred and unenforceable against the Debtor's Bankruptcy Estate, unless a proof of Claim is filed with the clerk of the Court and served on counsel for the Proponents within thirty (30) days after entry the Confirmation Order.

Furthermore, any licensee of intellectual property shall retain all of its rights even if the agreement is rejected as provided in Section 365 of the Bankruptcy Code, unless such license is otherwise avoidable in bankruptcy or subject to being set aside under non-bankruptcy law.

## XIII.   MODIFICATIONS AND AMENDMENTS

The Proponents may alter, amend, or modify the Plan or any Exhibits thereto under § 1127(a) at any time prior to the Confirmation Date.  After the Confirmation Date and prior to the Effective Date, the Debtor may, under § 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of holders of Claims or Equity Interests under the Plan; provided, however that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## XIV.   RETENTION OF JURISDICTION

Under 11 U.S.C. §§ 105(a) and 1142, and notwithstanding entry of the Confirmation Order and passage of the Consummation Date, the Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of

any request for payment of any Administrative Claim or Priority Claim or the resolution of any objections to the allowance or priority of Claims or Interest;

B.     Hear and determine all applications for compensation and reimbursement of expenses of Administrative Claims or Priority Claims;

C.     Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the liquidation or allowance of any Claims arising therefrom;

D.     Effectuate performance of and payments under the provisions of the Plan;

E.     Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

F.     Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

G.     Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

H.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, consummation, or enforcement of the Plan or the Confirmation Order;

I.     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

J.     Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

K.     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Debtor's Bankruptcy Case;

L.     Hear and determine matters concerning state, local, and federal taxes in accordance with §§ 346, 505, and 1146;

M.    Hear and determine all matters related to the property of the Debtor's Bankruptcy Estate from and after the Consummation Date;

N.    Hear and determine such other matters as may be provided in the Confirmation Order and as may be authorized under the provisions of the Bankruptcy Code; and

O.    Enter a final decree closing the Debtor's Bankruptcy Case.

## XV.    EFFECTS OF CONFIRMATION

### A.    BINDING EFFECT

The Plan shall be binding upon all present and former holders of Claims and Interests and their respective successors and assigns.

### B.    EXCULPATION AND LIMITATION OF LIABILITY

1.    None of the Debtor's Bankruptcy Estate, the Debtor, the Committee and the members of the Committee will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the solicitation of votes to accept the Plan, the Debtor's Bankruptcy Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or as provided by the Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

2.    No holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against the Debtor's Bankruptcy Estate, the Debtor, the Committee or any member of the Committee, for any act or omission in connection with, relating to, or arising out of the solicitation of votes to accept the Plan, or the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except as provided by the Plan or by law.

### C.    DISCHARGE

This is a liquidating Plan, and the Debtor does not intend to engage in operations after Confirmation of the Plan.  Therefore, there shall be no discharge granted in this case.

## XVI.    MISCELLANEOUS PROVISIONS

*Severability of Plan Provisions*.  If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Court, at the request of a party in interest, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be

applicable as altered or interpreted.   Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

*Successors and Assigns.*   The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

*Consummation of Plan.*   The Confirmation Order shall include (a) a finding by the Bankruptcy Court that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order; and (b) the Bankruptcy Court's authorization for the Proponents to consummate the Plan immediately after entry of the Confirmation Order.

*Governing Law.*   Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (i) the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, and (ii) corporate governance matters shall be governed by the laws of the state of incorporation, without giving effect to the principles of conflicts of law thereof.

## XVII.  CONFIRMATION OF THE PLAN

### A.    VOTING PROCEDURES AND REQUIREMENTS

The Proponents are providing copies of this Combined Disclosure Statement and Plan and Ballots to all known holders of Impaired Claims who are entitled to vote on the Plan.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims against the Debtor that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan.   Accordingly, Classes of Claims or Interests that are not Impaired under the terms and provision of the Plan are *not* entitled to vote on the Plan.   In addition, Classes of Claims or Interests that are not entitled to a Distribution under the terms and provisions of the Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Under the Plan, holders of Claims in Class 3 are, or may be determined to be, Impaired. Classes 3 is entitled to vote.   Classes 1 and 2 are not Impaired and are deemed to have accepted the Plan. Class 4 is Impaired and deemed to reject the Plan.   The following voting procedures (the "***Voting Procedures***") have been established with respect to the amount and classification of Claims and Interests, and the determination of the validity of Ballots submitted, for voting purposes:

Unless otherwise provided below, a claim will be deemed temporarily allowed for voting purposes in an amount equal to (i) if a timely filed proof of claim has not been filed, the amount of such claim as set forth in the schedules of assets and liabilities, filed by the Debtor or (ii) the amount of such claim as set forth in a timely filed proof of claim.

If a claim is deemed allowed in accordance with the Plan, such claim will be allowed for voting purposes in the deemed allowed amount set forth in the Plan.

If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim will be temporarily allowed for voting purposes in the amount so estimated or allowed by the Court.

Ballots that are otherwise validly executed but do not indicate either acceptance or rejection of the Plan will not be counted.

Only Ballots that are timely received with signatures will be counted.  Unsigned ballots will not be counted.

Ballots postmarked prior to the Voting Deadline, but received after the Voting Deadline, will be counted.

Ballots that are illegible, or contain insufficient information to permit the identification of the creditor, will not be counted.

If a creditor simultaneously casts inconsistent duplicate ballots, with respect to the same claim, such ballots shall not be counted.

Unless otherwise ordered by the Court, questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots shall be determined by the Bankruptcy Court at the Confirmation Hearing.

**IN ORDER TO BE COUNTED, EXCEPT TO THE EXTENT THE DEBTOR SO DETERMINE OR AS PERMITTED BY THE BANKRUPTCY COURT PURSUANT TO BANKRUPTCY RULE 3018, BALLOTS MUST BE SIGNED AND RETURNED SO THAT THEY ARE RECEIVED NO LATER THAN 5:00 P.M., ON _____, 2016 AT THE FOLLOWING ADDRESS:**

OKIN ADAMS LLP
Attn:  Christopher Adams
Email: cadams@okinadams.com
1113 Vine St. Suite 201
Houston, Texas  77002
Tel: (713) 228-4100
Fax: (888) 865-2118
CO-COUNSEL FOR COMMITTEE

**BALLOTS WILL BE ACCEPTED BY REGULAR MAIL, FACSIMILE OR EMAIL**

As mentioned above, if your Ballot is not signed and returned as described, it will not be counted.  If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by addressing a written request to Committee's co-counsel at the above address by regular mail, facsimile or email.  Please follow the directions contained on the Ballot carefully.

The process of soliciting acceptance of the Plan must be fair and open without outside influence in the form of representations, inducements or duress of any kind.  To the extent that you believe solicitation of your vote from any party is being sought outside of the judicially-approved and statutorily-defined disclosure requirements and Voting Procedures, please contact counsel for the Debtor.

## B.  ACCEPTANCE

Acceptance of the Plan requires that each Impaired Class of Claims or Interests (as classified therein) accepts the Plan, with certain exceptions hereinafter discussed below.  Thus, acceptance of the Plan requires acceptance by each of the Impaired Classes.

Classes of Claims and Interests that are Unimpaired under the Plan are deemed to have accepted the Plan.  Acceptances of the Plan are being solicited only from those persons who hold Claims or Interests of Impaired Classes.

The Bankruptcy Code defines acceptance of the Plan by a Class of Claims as acceptance by the holders of at least two-thirds (2/3) in dollar amount and a majority in number of Claims of that class, but for that purpose, only those Claims, the holders of which actually vote to accept or reject the Plan, are counted.

## C.  ACCEPTANCE OR REJECTION OF THE PLAN

*Classes Entitled to Vote.*  Each Impaired Class of Claims or Interests that will (or may) receive or retain property or any interest in property under the Plan shall be entitled to vote to accept or reject the Plan.  Ballots shall be cast and tabulated with respect to Claims against and Interests in the Debtor's Bankruptcy Estate.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.  Classes 1 and 2 is not Impaired and deemed to have accepted the Plan.  Class 3 is Impaired and is entitled to vote.  Class 4 is Impaired and deemed to reject the Plan.

*Acceptance or Rejection by Impaired Classes.*  An Impaired Class of Claims shall have accepted the Plan if (i) the holders (other than any holder designated under § 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan; and (ii) the holders (other than any holder designated under § 1126(e)) of more than one half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  A Class is deemed not to have accepted the Plan if the Plan provides that the Claims or Interests of such Class do not entitle the holders of Claims or Interests in such Class to receive or retain any property under the Plan on account of such Claim or Interest.

*Cramdown.*  The Debtor may request Confirmation of the Plan, as it may be modified from time to time, under § 1129(b) ("*Cramdown*") if necessary and/or applicable.

## D.  CONFIRMATION OF THE PLAN

To confirm the Plan, § 1129 requires the Bankruptcy Court to make a series of determinations concerning the Plan, including, without limitation: (i) that the Plan has classified Claims and Interests in a permissible manner; (ii) that the contents of the Plan complies with the

technical requirements of the Bankruptcy Code; (iii) that the Debtor has proposed the Plan in good faith; and (iv) that the Debtor has made disclosures concerning the Plan which are adequate and include information concerning all payments made or promised in connection with the Plan and the Companion DX Bankruptcy Case.  The Debtor believes that all of these conditions have been or will be met with respect to the Plan.

The Bankruptcy Code requires that, unless the Cramdown provisions of the Bankruptcy Code (as discussed below) are utilized, as a condition precedent to confirmation, the Plan be accepted by the requisite votes of each Class of Claims and Interests voting as separate Classes. Therefore, the Bankruptcy Court must find, in order to confirm the Plan, that the Plan has been duly accepted.  In addition, the Bankruptcy Court must find that the Plan is feasible and that the Plan is in the "best interests" of all holders of Claims and Interests.  Thus, even if holders of Claims were to accept the Plan by the requisite number of votes, the Bankruptcy Court is still required to make independent findings respecting the Plan's feasibility and whether the Plan is in the best interests of holders of Claims and Interests before it can confirm the Plan.

## E.      THE BEST INTERESTS TEST

Whether or not the Plan is accepted by each Impaired Class of Claims entitled to vote on the Plan, in order to confirm the Plan the Bankruptcy Court must independently determine, pursuant to § 1129(a)(7), that the Plan is in the best interests of each holder of an Impaired Claim or Interest that has not voted to accept the Plan.  This requirement is satisfied if the Plan provides each non-accepting holder of a Claim or Interest in such Impaired Class a recovery on account of such holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution each such holder would receive in a liquidation of the Debtor under Chapter 7.  This requirement is commonly referred to as the "Best Interests of Creditors Test." The Plan satisfies this test.

The Plan provides the possibility for a greater recovery to the creditors than such creditors would receive under a liquidation pursuant to chapter 7. The Liquidating Trustee will be able to pursue the Retained Claims, including Avoidance Actions, and the collection of the Accounts in a cost-effective manner, while in a chapter 7 the Debtor's estate would be burdened with an additional layer of administrative expense associated with the appointment of a chapter 7 trustee, and retention of professionals attendant thereto. The Plan, in essence, increases the efficiency of administrating the Debtor's assets for the benefit of its creditors.

Additionally, holders of Class 3 Claims and of Class 4 Interests would not receive any distribution in a chapter 7 liquidation based on the cash held by Estate as of the date of this Combined Plan/DS, as it is insufficient to pay creditors of a higher liquidation priority (including holders of Administrative Claims who have agreed to defer payment of their Claims).  To the extent additional recoveries are made to the Estate and/or the Liquidating Trust in excess of the amount required to pay all Classes 1 and 2 and Allowed Administrative Claims, such would be paid to Allowed Class 3 Claims in accordance with their subordinated priority.  Thus, holders of Class 3 Claims and Class 4 Interests are not receiving less under the Plan than they otherwise would.

Moreover, in chapter 7 cases, the chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtor, due to the Sale of substantially all of its assets, has already liquidated most of its assets, has collected of the proceeds thereof including the cash used to fund the Plan and has already incurred many of the expenses associated with the foregoing.  Accordingly, the Proponents believe that there is a reasonable likelihood in a chapter 7 scenario that holders of Allowed Claims would have to pay doubly for the funds accumulated in the Estate, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed.

It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to holders of Allowed Claims.  Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than ninety (90) days following conversion of the case to chapter 7.  Thus, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Bankruptcy Case.

In short, the Plan presents a superior alternative to a chapter 7 liquidation.  Creditors' potential recovery under the Plan is not expected to be less than what could be obtained in a hypothetical chapter 7 liquidation.  The analysis outlined above and the circumstances of the case lead the Proponents to believe that the recovery in a chapter 7 scenario might be limited to the funds from those available in the Estate as of the date of the Combined Plan/DS.  This is because there are no material tangible assets to liquidate and any recovery is expected to come from the prosecution of the Retained Claims and the collection of the Accounts.  By putting in place a Liquidating Trustee to investigate and, if viable, pursue the Retained Claims and collect the Accounts, the Plan makes it more likely that the causes of action will be liquidated to generate additional recovery to the estate.  The support, motivation and involvement that will be provided by the Trust Advisory Board (which would not be available in a chapter 7) bolsters this conclusion.  As such, it is more likely that a higher recovery can be obtained under the Plan than in a hypothetical chapter 7 scenario and, even if it were ultimately in the form of low value recoveries in settlement of claims, such recoveries would be better than (and certainly no worse) than the expected result in a chapter 7.

Based on the foregoing, the Plan provides an opportunity to bring the greatest return to creditors.

## F.  FEASIBILITY

The Plan is a liquidating plan, and the proceeds of the liquidation of the Debtor's assets shall be distributed to satisfy the claims of creditors to the extent possible.

## XVIII.  DISCLAIMERS

*The Proponents have No Duty to Update*.  The statements contained in this Disclosure Statement and Plan  are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement and Plan  after that date does not imply that there has been no change in the information set forth herein since that date.  The Proponents have no duty to update this Disclosure Statement and Plan unless otherwise ordered to do so by the Bankruptcy Court.

*Source of Information*.  Counsel for the Committee has relied on pleadings filed in the Bankruptcy Case and Counsel for Debtor has relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement and Plan.  Although counsel has performed certain limited due diligence in connection with preparing this Disclosure Statement and Plan, no independent verification of the information contained herein has been performed.

*No Legal or Tax Advice Provided*.  The contents of this Disclosure Statement and Plan should not be construed as legal, business or tax advice.  Each creditor or holder of an Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

*This Disclosure Statement and Plan is not legal advice to you*.  This Disclosure Statement and Plan may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

*No Admission Made*.  Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Proponents) or be deemed evidence of the tax or other legal effects of the Plan on the Proponents or on holders of Claims or Interests.

*No Regulatory Agency Approval*.  No governmental or other regulatory agency approvals have been obtained as of the date of the mailing of the Plan and Disclosure Statement and Plan.

## XIX.   CONCLUSION AND RECOMMENDATION

The Proponents believe that Confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests.  The Proponents therefore urge you to vote to accept the Plan and to evidence such acceptance by returning the Ballot(s) so they will be <u>received</u> by the Voting Deadline.

Dated: December 22, 2016.

**PENDERGRAFT & SIMON**

By:   _/s/ Leonard H. Simon_
Leonard H. Simon, Esq.
TBN: 18387400; SDOT: 8200
The Riviana Building
2777 Allen Parkway, Suite 800
Houston, Texas 77019
(713) 737-8207 (Direct)
(832) 202-2810 (Direct Fax)
lsimon@pendergraftsimon.com
**ATTORNEY IN CHARGE
FOR DEBTOR**


**OKIN ADAMS LLP**

By:   _/s/ Christopher Adams_
        Christopher Adams
        TBN. 24009857
        1113 Vine St. Suite 201
        Houston, Texas  77002
        Tel: (713) 228-4100
        Fax: (888) 865-2118
        Email: cadams@okinadams.com

**CO-COUNSEL FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**